IN THE MATTER OF THE ESTATE OF HARVEY KING, DE-
CEASED.     GEORGE B. NYE v. GEORGE H.
LOTHROP, ADMINISTRATOR, ETC.

*Bills and notes—Consideration—Interest—Statute of limitations—
New promise.*

1. Interest does not begin to run on a demand note until an actual demand of payment is made, or a suit is instituted, which is treated as a sufficient demand.

2. In response to the request of a payee that the maker give him a new note for the principal and interest of the old one, made a day or two before its outlawry, the maker indorsed on the note, "the within note shall not be outlawed," and signed the indorsement, and delivered the note to the payee, with the remark that that would make it all right with him. And it is held that the effect of the indorsement was to renew the original promise to pay, and that it was a sufficient acknowledgment to take the case out of the statute of limitations; citing *Crane v. Abel*, 67 Mich. 242.

3. The following propositions are summarized from the opinion of Mr. Justice DURAND:

    *a*—An employer has a right to place his own value upon the services of an employé, and, having once done so upon some consideration, its mere inadequacy cannot be used by his administrator to defeat the claim of the employé therefor, when presented for allowance against the employer's estate.

    *b*—The presumption of the law is in favor of honest rather

than dishonest motives; and if it is claimed that an employé has misappropriated money with which he has been intrusted, such misappropriation must be shown before a claim can be established against him on account of it.

Error to Wayne. (Brevoort, J.) Argued November 2 and 3, 1892. Decided December 24, 1892.

Claim against the estate of decedent. Defendant brings error. Judgment modified and affirmed. The facts are stated in the opinion of DURAND, J.

*Cyrus E. Lothrop* (*Levi T. Griffin* and *Otto Kirchner*, of counsel), for appellant.

*C. H. Freeman* (*F. A. Baker* and *John D. Conely*, of counsel), for claimant.

DURAND, J.   In this case an issue was framed in the circuit court for the county of Wayne on an appeal from the probate court of the same county. The claim asserted was for services of the claimant for Harvey King, the intestate, from October 21, 1881, to August 15, 1887, at $2,500 per year, and amounting, with interest, less certain cash acknowledged in payment on the account, to the sum of $15,667.74; also upon a promissory note given by the intestate to the claimant, of which the following is a copy:

"14,000.00.                     DETROIT, Oct. 21, 1881.
"On demand after date I promise to pay to the order of George B. Nye fourteen thousand dollars, at McLellan & Anderson's banking office, value received, with interest at the rate of seven per cent. per annum after maturity.
                                        "HARVEY KING."

Indorsed upon the note is the following:

                                        "DETROIT, Oct. 20, '87.
"The within note shall not be outlawed.
                                        "HARVEY KING."

The administrator pleaded the general issue and the

statute of limitations, and gave notice of set-off and inadequacy of consideration for the note. The case was on trial for about 25 days, and the claims as finally submitted to the jury were—First, for the note and interest, amounting to $23,519.61; and, second, for services from June 19, 1883, to August 17, 1887, less the credits, amounting to $4,575.06,—both together amounting to $28,094.67, and which by the verdict of the jury were allowed at $25,366.78.

The intestate died June 14, 1889. He had been four times married. His second wife was Mrs. Nye, the mother of the claimant, by whom he had two children, Russell and Florence Bessie King, who survive him, as do also three children by his first wife and two children by his third wife. His fourth wife also survives him, but there were no children born of that marriage. At an early day he was engaged in a general farming and dairy business on the Holden road on Cass farm, which he continued until 1867. About 1855 he established stock yards at the corner of Second and Grand River avenues, in the city of Detroit, and continued to run them until September, 1885. In 1862 he built the "Brighton House" at the stock yards, and changed his residence to it from the Holden road. In 1884 he began the erection of new stock yards on Twelfth street, to which the stock and business were transferred in September, 1885; and he continued to run these yards until August, 1887, when he leased them to a firm, of which claimant was one, at a rental of $100 per week, and who continued the business thereafter at the same place. In 1875 he purchased a large tract of pine timber lands in Lapeer county, on which he erected houses and mills known as "King's Mills," to which place he removed that year, and where he continued to reside and carry on the lumbering and farming business until he commenced the construction of the new stock yards, in 1884, when he changed his residence to the new yards, where he con-

tinued to reside, except that at certain portions of each year he would go to live on his estate in Lapeer county. It will thus be seen that he was a man of affairs and conducting large business interests of various kinds during his life.

Nye, the claimant, began to work for King, peddling milk, collecting moneys, and assisting him about the farm and dairy business, when he was quite young, and some time prior to the time when King married his mother. He continued in King's employment until 1867, when he went into business for a short time on his own account. In July, 1870, he again entered the service of King as clerk, bookkeeper, barkeeper, and general overseer of the hotel and stock business, and continued performing those duties until Mr. King removed to Lapeer, in 1875. From that time until August, 1887, he continued in the same service, performing the same duties, and also collecting rents and looking after the rented property, consisting of stores and dwelling-houses, belonging to Mr. King. The record shows that during all the time claimant was in Mr. King's employment, from 1855 to 1887, he worked from very early in the morning to very late at night, during every day of the week; that he was very attentive to the business, economical in his habits, and that for many years he was only absent from his labors for a short time upon one occasion, when he accompanied Mr. King on a trip east. He was therefore in the constant and faithful service of Mr. King for a period of about 30 years, exclusive of the time he was in business for himself; and his service finally ended in August, 1887, as stated.

The record shows that in October, 1881, King went to the banking office of McLellan & Anderson, and said to Mr. McLellan: "Andrew, I would like to have you fill out a note for $14,000: I want to give it to George Nye." Mr. McLellan testifies that he thereupon filled out the note

as requested, and handed it to Mr. King, who said it was all right, and started away with it. This note must have been delivered to the claimant shortly afterwards, for Florence Bessie King, a daughter of the intestate, testifies that, about a month after the note was made out, Mr. Nye brought it to her for safe-keeping, as he was accustomed to do with his other valuable papers; that she retained its possession until her father's death, in June, 1889, with the exception of a few days, when she left it with her father under the following circumstances, as she relates them:

"At the time I was living at the stock yards, and I thought I would make my father a visit at King's Mills, because I was accustomed to go up there about once a year for a few days or a week, and I spoke to George about taking the note up with me. I took the note to father, and with the other papers that George had given me, and told him that George wanted a new note made out; that the old note would be outlawed in a few days, and he wanted a new note made out. George had made out an account on this note of $14,000; he had reckoned the interest on it for six years; and then he had made out a new note for the full amount, which was about $21,000, I believe, and he gave the three papers to me, and wanted me to have father sign the new note, and keep the old note. * * *

"Q. Detail the circumstances of leaving the note with your father at the mills,—what took place with reference to the note?

"A. I went into the room where father was sitting, and I gave him the three papers, and told him George wanted the new note; and he took the papers, and he looked at the amount of the new note, and he seemed surprised at the amount. I do not remember exactly what he said, but he seemed very much surprised at the amount, but he said he would keep it, and he would bring them down with him when he came down in a few days, and he did not tell me whether he would sign the new note or not. At that time that was all that passed between my father and me in regard to it.

"Q. Did he state anything about the interest?

"A. He gave the reason why he wanted to keep the papers.

"Q. What did he say as a reason?

"*A.* That he would examine the papers.

"*Q.* The three papers?

"*A.* Yes, sir; and then before I came to Detroit I asked him for the new note, and he said he would bring it down with him when he came in a day or two.

"*Q.* This new note George had written and sent up there?

"*A.* Yes, sir.

"*Q.* And you came away and left the papers in his possession?

"*A.* Yes, sir; I did.

"*Q.* When did you again see this note?

"*A.* Well, a few days afterwards father came down, and the next day, I think it was, he brought me that note with the writing on the back, and he said, as he handed it to me: 'There, that will make it all right with George.' He did not say anything about the new note. That was all he said.    *    *    *    *    *    *    *    *    *

"*Q.* Upon what day of the month was that?

"*A.* Well, I could not say. I know it was very near the 21st, because I had the thought in my mind if it had been the 22d it would have been outlawed; there would have been one day, I had thought in my mind. It may have been the 20th, or it may have been the 21st.

"*Q.* What did you then do with the note?

"*A.* I put it away in this box that I had always kept it in.

"*Q.* Did you inform your brother of the fact it had been returned to your possession?

"*A.* Yes, sir; I told him father had."

Under the issue framed, the claimant insisted upon the trial that the note was based upon a sufficient consideration; that it was given to him by his step-father, Mr. King, in payment for valuable and long-continued services rendered by him; that Mr. King had placed his own value upon those services, and placed it at $14,000; that the indorsement, "The within note shall not be outlawed," written upon the back of the note by Mr. King, under the circumstances related, was in effect a new promise, which prevented it from being barred by the statute of limitations, and that it was a valid, subsisting claim,

enforceable against the estate of the intestate. On the other hand, the contestant insisted that there was no adequate consideration for the note, and, if there were, that it was outlawed, notwithstanding the indorsement referred to. Proof was also introduced to show that Mr. King was sick on the day the note bears date, and unable to be at the banking office where the witnesses swear it was signed; but this question was settled by the verdict of the jury in favor of the claimant.

In relation to the claim for services after the note was given, the claimant withdrew the claim for services from October 21, 1881, to June 19, 1883, which period was over six years before the death of Mr. King, and claimed that under the proof he was entitled to $100 per month for his services after that date, so long as those services continued, and that with the exception of certain credits, for which he gave an account, the balance of the claim was unpaid. On the other hand, the contestant insisted that there was an agreement between the claimant and the intestate that his services were to be at $50 per month, which view the jury seem to have taken as the correct one. He also insisted that, inasmuch as the claimant had the handling of a good deal of Mr. King's money, he had a right to pay himself out of it, and that it was a fair presumption he had done so. Testimony was also given tending to show that at times both the intestate and the claimant were without much ready money, and that their debts were not always paid at maturity; that the claimant was not always desirous of paying his debts promptly; and that sometime in the year 1884 he had transferred some of his land to his brother without consideration, in order to delay or defraud his creditors.

The case seems to have been tried with a great deal of spirit and ability upon both sides, and everything which

94 MICH.—27.

counsel thought would tend to give the jury a full insight into the character, habits, relationship, motives, and condition of the parties, or which would fairly tend either to sustain or defeat the claim, the circuit judge admitted testimony to be given in relation to.          That this is so is apparent when it is seen that the attention of this Court is only called to certain objections which are the basis of the 1st, 2d, and 3d assignments of error in relation to the admission of testimony, and which were made by the contestant in reference to the competency of the witness E. W. Voigt to testify in relation to the value of some of claimant's services.          This objection was overruled by the circuit judge, and we think his ruling on that point was correct.          It certainly was not prejudicial, as the verdict of the jury shows clearly that the value put upon the services by him was not adopted by them.

It would be impossible, and it is certainly quite unnecessary, to detail all the facts contained in the record, and which are referred to and commented on through 289 pages of the printed briefs, to which the attention of this Court has been challenged by the counsel for the respective parties to this contest.          So many of the facts have been stated, however, as are necessary to be considered in arriving at a decision.

The remaining objections relate to the charge to the jury. The 9th, 10th, 11th, 12th, 13th, and 14th assignments of error all relate to the charge of the court in reference to the consideration for the note.          Upon this point the court charged substantially that the claimant was not entitled to recover upon the note unless it was based upon a valuable consideration, such as services, money, or the like; that the note imported upon its face that it was given for a valuable consideration, yet if all the evidence in the case failed to satisfy the jury, by a preponderance of proof,

that value was in fact received for the note, no recovery could be had upon it; that the sufficiency of the consideration could not be inquired into; that it was sufficient if there was a consideration; and that when parties have fixed their own price upon services, and have put that price into a note, it is immaterial whether the price fixed is large or small; that, if Mr. King chose to allow that price for the work, neither his heirs nor courts or juries could set it aside. There is much more on that point of the same character embodied in the charge, but all of the same general tenor. We see no error in this part of the charge. There is no proof of fraud, nor of a total lack of consideration, nor of any facts which would warrant the jury in saying that it was a mere gift, by Mr. King, of an executory promise to pay. Mr. King had a right to place his own value upon the services of the claimant, and, having done so upon some consideration, the mere inadequacy of that consideration could not be used in this proceeding to defeat the note, even though there were proof of such inadequacy, which is not at all clear.

The eighth assignment of error relates to the substitution of the words "Does the evidence tend," for "There is evidence tending to," found at the beginning of contestant's thirteenth request to charge. As given by the court it reads as follows:

"Does the evidence tend to show that the claimant, in the latter part of the year 1884, made a transfer of the real estate owned by him to his brother Theodore W. Nye, with the intent to defraud his creditors, and that such transfer was wholly without consideration? If the jury find the fact so to be, such conduct on the part of the claimant would necessarily imply a lack of honesty and integrity on his part, and the jury would be justified from that fact alone in regarding the claim made by him with suspicion."

Again, the judge charged the jury:

"If you find from the evidence that the claimant has been guilty of transactions involving moral turpitude and dishonesty on his part, you are justified in discrediting any claim made by him that on its face appears to be out of the ordinary and usual course of business methods."

Had the verdict been against the claimant, he would, as we conceive it, have had much better reason for complaining of this part of the charge than has the contestant. It having been given, however, at the request of the contestant, though slightly altered in phraseology, he certainly has nothing to complain of.

The court declined to give contestant's fifth request to charge, which was, in effect, that "there is evidence tending to show that the claimant's claim was fully paid, and, if the jury so find the fact to be, the claimant is not entitled to recover;" and in this connection the court charged:

"Before the jury can allow any set-off against the claim proven in this cause, the estate must show by competent testimony that Nye at the time of Harvey King's death was indebted to King, and merely showing that Nye received moneys in the course of King's business, which the records of the business, under the manner of the dealings shown by the testimony, may not disclose as having been paid out by Nye, does not establish any indebtedness from Nye to King. The checks offered in evidence cannot be allowed as a set-off in this case, as it has not been shown that they were received as payment, or not properly accounted for to King."

And this is claimed as error under the seventh and fifteenth assignments of error. We do not think this was error, and, if it were, it was not prejudicial, for afterwards the circuit judge, at the request of the contestant, charged the jury as follows:

"The general presumption of law is that when a person is proved to have received moneys for the use and benefit of another, in the absence of showing to the contrary, he has not accounted for them, and it devolves upon him to

show that he has done so. In the case of the master and the servant, where the servant is working and receiving the money under the immediate care of his employer, this presumption would be but slight, if it obtained at all; but where the servant resides, receives, and collects the moneys of his employer at a considerable distance, and not immediately under the superintendence and guidance of his employer, the presumption would be much stronger, if not, indeed, as strong as if the relation of master and servant had not existed between the two. But where the servant is claimed to have been the creditor of his employer during the time that the moneys were collected and received by him, this fact is sufficient to establish the presumption that he applied the moneys received by him to the payment of his claims, in the absence of any showing to the contrary. If, therefore, you should find that the claimant, being the creditor of Mr. King, as claimed by him, received sums of money for the use and benefit of Mr. King sufficient to pay and satisfy his claim over and above the moneys he is shown to have paid to or for the accounts of Mr. King during his life-time, the presumption must be that he applied such moneys to the payment and satisfaction of his claim, and your verdict must be for the estate.

"If Nye was the creditor of Mr. King, as claimed by him, during the time he is shown to have received moneys for the use and benefit of Mr. King, he had a perfect and absolute right, legally and morally, to appropriate such moneys to his own use up to an amount sufficient to satisfy and extinguish the indebtedness due from Mr. King to him, and his action in so doing could not have been questioned civilly or criminally."

The charge in that particular was much more liberal than the contestant had a right to, for the presumption of the law is in favor of honest rather than dishonest motives; and, if it is claimed that an employé has misappropriated money with which he has been intrusted, such misappropriation must be shown before a claim can be established against him on account of it.

The fourth assignment of error is based upon the request for the circuit judge to charge that the claimant was not entitled to recover upon the note. Presumably this

request was founded on the claim that the indorsement of October 20, 1887, that "the within note shall not be outlawed," written by the intestate on the back of the note, and signed by him, was of no avail to continue or renew the promise to pay, and to be of effect as against the statute of limitations. We do not agree with this contention. It is plain that the intention of Mr. King was that the words employed by him should be considered as a written renewal of the promise contained in the note, and that the effect of the indorsement was to renew the promise at that date. To put any other construction upon it would be to impeach the fairly expressed words of an honorable man, and to brand the statement, " There, that will make it all right with George," which he made to his daughter when he handed the note back with the indorsement written upon it, as a cunningly devised falsehood, coolly and deliberately planned for the purpose of lulling the claimant into a fancied security, until by the delay of a single day his right would be lost and his claim forever barred. The conduct of Mr. King upon that occasion was open, fair, and honest beyond criticism. He did not see fit to give a new note for the amount, with accumulated interest added, but it is plain that he did wish that his original promise should not outlaw; and it would be monstrous for a court to put any other than an honest construction upon what he did and said, or to say that his heirs or personal representatives should not accept as true and binding that which the intestate not only did not deny, but which he led the claimant to believe was a liability against him which he fully recognized and reasserted. Without citing the long list of authorities *pro* and *con* upon this question, to which our attention has .been called by the briefs, if there were any doubt upon the question, we would, as we do, consider it ruled by the principle asserted in the case of *Crane v. Abel*, 67 Mich. 242, in which a similar indorse-

ment was held to be a sufficient acknowledgment to take the case out of the statute.

The sole remaining question is one which relates to the time at which interest began to run upon the note. The claimant insists that it bore interest from its date, and the circuit judge so charged the jury. The contestant insists just as strenuously that it did not, and also insists that interest did not begin to accrue upon it until it was presented to the commissioners for allowance; and this question is raised by the 5th, 6th, and 16th assignments of error.

The note in question is payable on demand after date, with interest at the rate of 7 per cent. after maturity. By its terms, therefore, interest begins to run at the maturity of the note, or, in other words, as soon as it is due, for that is the meaning of the term as employed in reference to promissory notes and other commercial paper. If it has not already been settled in this State, the question should be settled now, whether a note payable upon demand is due as soon as it is signed and delivered, or whether it does not mature until after payment upon it has been demanded. It is of great importance, not only to the profession, but also to the great body of business men throughout the State, who are daily engaged in giving, receiving, and dealing in that class of paper. As was said by Chief Justice Parker in *Field v. Nickerson,* 13 Mass. 135:

"It is remarkable that the law relating to so familiar a species of written contract as a promissory note of hand, payable on demand, should at this late period be doubtful. * * * Opinions of respectable lawyers and others among us differ widely respecting the character and legal qualities of this contract. * * * In this state of uncertainty it is highly necessary that the rule of law should be made known, for contracts of this kind are in daily use in all parts of the state, and the rights and duties of parties who may hold or be liable upon them ought to be precisely

ascertained, if possible. The nature of the contract must be inquired into for this purpose. Between the promisor and promisee there is no difficulty. * * * As it respects the promisor himself, he is answerable immediately to the promisee or indorsee, and he may be sued the instant he has given his signature, even without a previous demand."

In *Hitchings v. Edmands,* 132 Mass. 338, it was held that a note payable "on demand after date" was payable instantly. This doctrine was approved and adopted in *Fenno v. Gay,* 146 Mass. 118. (15 N. E. Rep. 87).

In the case of *Wheeler v. Warner,* 47 N. Y. 519, Mr. Justice Peckham, in discussing the question of when a demand note becomes due, says:

"There is no divided opinion here or in England that upon such a note, with or without interest, an action may be maintained against the maker without any demand because it is due. No demand can be sued before due. No action will lie upon any claim of any description arising upon contract before it is due. To say that the suit is the demand is to repeat an unmeaning phrase, as thus used, which no number of repetitions can make sensible. A demand note is due forthwith, and hence may be sued without demand."

In support of his opinion he cites *Howland v. Edmonds,* 24 N. Y. 307; *Herrick v. Woolverton,* 41 Id. 581; Ang. Lim. § 95; Darb. & B. Lim. 20, and cases cited.

In *McMullen v. Rafferty,* 89 N. Y. 456, the court say:

"The word 'demand' is not treated as part of the contract, but is used to show that the debt is due."

If a note or bill is payable on demand, it is always mature, and may at any time be demanded. As between the maker and the holder, so far as maintaining an action on the note is concerned, no other demand than serving the writ is necessary, nor need any demand be averred in the declaration, nor, if it be averred, need it be proved. 1 Pars. Notes & B. 374. Bills and notes payable on demand are due immediately, without grace, unless the rule is

changed by statute. A demand note is payable instantly, and upon such notes interest accrues and the statute of limitations runs from date. 2 Amer. & Eng. Enc. Law, 327, 396, and cases cited.

We think, also, that this rule has already been adopted as settled law in this State by the doctrine asserted in the well-considered case of *Palmer v. Palmer*, 36 Mich. 487. The action in that case was upon a note payable 30 days after demand. No demand was made until 6 years and 7 months after its date; and, the statute of limitations being pleaded, the question to be decided was whether the statute began to run at the end of the 30 days mentioned in the note, or whether it only ran from the date of the demand. If the latter, then the suit was in time, as a demand had been made within the prescribed period before the suit was brought. It was held that the action was barred; and Mr. Justice CAMPBELL, in delivering the opinion of the Court, says:

"It is now well settled that a note payable on demand is payable at once and without demand, so that the statute runs from its delivery. And this rule has been applied where, from the form of the contract, it is manifest that immediate payment was not expected."

The claim that it was not necessary to assert this rule, or that a decision of that case could have been properly made without asserting it, or something equivalent to it, is not well founded. It was the real reason given for the conclusion arrived at, and numerous authorities were cited in support of its soundness. The claim that other language was used in that opinion, from which it might be inferred that the case could have been decided without the application of the rule, is not well taken, as it is apparent that the conclusion was based upon the fact that a note payable upon demand is due as soon as signed and delivered, and that whatever else was said was by way of argument

against the impropriety and injustice of permitting the holder of such a note to determine for himself when it should be considered due. Had the rule stated always been adhered to, and if no attempt had been made by courts to meet the exigencies of a particular case, by intimating that a note payable on demand can be due for one purpose, but not for another, much confusion might have been avoided, and the "unmeaning phrases upon that subject, which no number of repetitions can make sensible," complained of by Mr. Justice Peckham in *Wheeler v. Warner, supra,* would not now confront both the bench and bar with their uncertainties. While there are cases which have appeared to hold otherwise, yet the great weight of authority is in favor of the rule enunciated, and, it having been recognized as the correct one in *Palmer v. Palmer,* as quoted, we think that case decisive of the question here.

Applying that rule to this case, it is clear that interest must be allowed upon the amount of the note from its date. While the note bears date October 21, 1881, yet the promise to pay contained in it expired in six years from that date, and the note is only saved from the bar of the statute by reason of the indorsement made upon it on October 20, 1887. Mr. King had declined to sign a new note for the principal and accumulated interest added, but was willing to and did sign the agreement reading, "The within note shall not be outlawed." The effect of this indorsement, under the circumstances attending the transaction as shown by the testimony, was to renew the promise contained in the note to pay $14,000 on demand, with interest from the date of the indorsement. In other words, it must be considered as a new promise, made at that date, to pay the amount of the principal, with interest thereafter, but not a promise to pay interest already accumulated, for that was not the intention of Mr. King

in making the indorsement, and we do not think it should be given an effect contrary to his intention, when the indorsement itself does not require that this construction shall be put upon it. Interest should therefore be allowed on the note at 7 per cent. from the date of the new promise made on October 20, 1887, and which, for the purposes of this case, must be held to be the date of the note. For this reason the court was in error in permitting interest to be given upon the note from October 21, 1881, as it should have been allowed only from the time of the new promise. As the error can be remedied by a mere computation, it is not necessary to send the case back for a new trial.

Under the view we have taken, the judgment should have been for the amount allowed by the jury, less $5,880 of interest allowed for six years on $14,000 at 7 per cent., which would leave the sum of $19,486.78 as the amount which should have been allowed by the jury at the time of their verdict, on July 8, 1891. Adding interest from that date to the present time would make the amount $21,454.94, and a judgment for that sum will be entered here for the claimant. For the error shown, the contestant will recover the costs of this Court.

GRANT, J., concurred with DURAND, J.

MONTGOMERY, J. I concur in the result reached by Mr. Justice DURAND in his opinion, but I place my concurrence on the ground that interest did not begin to run on the note until demand was made. 2 Daniel, Neg. Inst. § 1458; *Hunter v. Wood*, 54 Ala. 71; *Breyfogle v. Beckley*, 16 Serg. & R. 264; *Wallace v. Wallace*, 8 Ill. App. 69; *Nelson v. Cartmel's Adm'r*, 6 Dana, 8; *Cannon v. Beggs*, 1 McCord, 370; *Scovil v. Scovil*, 45 Barb. 517; *Crim v. Starkweather*, 88 N. Y. 339. In this case demand must be treated as having been made at the date when the

indorsement was made upon the note by Mr. King in his life-time.

The cases cited by Mr. Justice DURAND are mainly cases where the question arose as to whether the note involved was barred by the statute of limitations, and it was held that the note became due for the purpose of setting the statute of limitations running at once. The basis of this holding apparently is that it rests with the holder of the note to make the note due at once by bringing suit, the institution of suit being treated as a sufficient demand. It may well be held that the cause of action accrues to a plaintiff at the earliest time when he may, of his own volition, institute proceedings, as was said in *Palmer v. Palmer*, 36 Mich. 487. It is an apparent anomaly in the law to treat the institution of suit as a sufficient demand, but the doctrine has become too firmly fixed to be now questioned. There are no cases, however, which I have been able to find, except such as depend upon statute in Ohio and Arkansas, which hold that interest begins to run upon a demand note prior either to an actual demand before suit, or the institution of suit, which is treated as a sufficient demand.

McGRATH, C. J., and LONG, J., concurred with MONTGOMERY, J.