The opinion of the court was delivered by
Nicholls, C. J.
Dr. Eugene Rabasse, a citizen of France, but for many years a resident of the city of New Orleans, died in that city on the 26th of February, 1895, leaving a last will and testament, by which the bulk of his fortune was left to collateral relatives, living in France. Armand Bossu was appointed and qualified as dative testamentary executor of the will.
The testamentary executor having filed an account of his administration, a number of persons opposed the same. Among those were Theodorine Belly (wife of Alphonse Foulqaier), Miss Marie Alex-andrine Maury, Pierre Lavigne, the Oharity Hospital in New Orleans and Albert Lavigne.
The District Oourt rejected entirely the opposition of Mrs. Foul-quier, Pierre Lavigne and the Charity Hospital, and rejected in part that of Miss Maury and of Albert Lavigne, giving judgment in favor of Miss Maury for the sum of five hundred dollars, and in favor of Albert Lavigne (or rather of F. Rivers Richardson, who became before trial the assignee of Albert Lavigne’s claim) for the sum of three hundred dollars.
All five of the opponents appealed.
The testamentary executor and the heirs moved in the Supreme Court to have the judgment in favor of Miss Maury, and that in favor of Albert Lavigne, reversed, and these demands rejected in entirety.
It is objected that no amendments can be made, as this case was • first fixed for trial for Tuesday, March 16, 1897, and the answers of the heirs at law, claiming an amendment, were not filed until April 10, 1897. That though it be true the executor had filed an answer to the appeal previous to the first fixing, yet his answer presents no issue to the court to be tried, for the reason that he and the succession proper (in so far as he represents the same) are without any interest in the result of the opposition. That the succession was *1408 fully solvent, even admitting all the claims set up in opposition, and would leave a large surplus. That the heirs had made themselves parties to the proceedings in the lower court and opposed the claims, and the only persons to be affected by the judgments would be the heirs themselves, and it was for them to ask for an amendment, not the executor. The intervention of the heirs and their joining the executor did not have the effect of dismissing the latter from the suit. The oppositions were directed to his account, and he is necessarily a party until all the issues raised by his opponents are finally disposed of contradictorily with him. We think he was authorized to-move for the amendment he did, and it is conceded that the motion was in time if made by one authorized to make it.
Miss Maury’s opposition is based upon a claim that the succession is indebted to her in the sum of twenty-five thousand dollars, with eight per cent, per annum interest from the 1st of May, 1894. She alleged “ that she was the holder and owner of an obligation of the following tenor and obligation:
“$25,000. Nouvelle Orleans, ler Mai, 1894.
“Une année apr&s date je prométs de payer ámon propre ordre la somme de vingt-cinq mille piastres pour valeur regue, avec interets a 8 pour cent, par an, á partir de cette date jusqu’a parfait paiement. “$25,000.
(Signed) “ E. Rabasse.”
That said note was delivered in person by said Eugene Rabasse to Jean Maury for a valuable consideration, as mentioned therein,, and she acquired said note from said Jean Maury, her father, for a valuable consideration.
On the 81st of May, 1895, Miss Maury filed a supplemental and amended opposition, in which she averred that from the year 1872 to the day of his death, on the 26th of February, 1895, the late Eugene Rabasse was on the closest terms of intimacy with her father and family, consisting of Jean Maury, his wife, and their daughter, the opponent. That when in New Orleans, not pursuing his avocation and profession in the country, said Rabasse was a constant and assiduous visitor of opponent’s father’s family, where he constantly and almost daily dined at the table of the family. That her father was a master cook and served as such in establishments of consequence, and was, at the time of the filing of the opposition, retired *1409 from service. That Rabasse was a bachelor well advanced in years, greatly enjoyed to be in the company of opponent’s family and to dine with them, and greatly relished the fine and .dainty dishes prepared by opponent’s father and served for him and the family whenever he dined with them. That he always expressed to the family his great appreciation and gratification at the trouble taken to receive him. That Rabasse, who was a very wealthy man, always promised to remember the family who treated .him so well, when he would make his will, and to recognize the kind attention and treatment at their hands and the pleasant hours passed in their company. That he repeatedly made said promise in presence of the family and other witnesses, to whom he expressed his great gratification and appreciation of his treatment by the family. That on the 1st May, 1894, the maker of the note sued on (Eugene Rabasse), in opponent’s presence, and that of Pierre Lavigne, transferred and delivered to opponent’s father, Jean Maury, for the consideration related and for the family, said note, at the time above stated, at his residence at the corner of St. Peter and Royal streets. That since the repeated promises made by said Rabasse to recompense opponent’s family for their long continued kindness and attention to him and before his transfer and delivery of said note to opponent’s father, Jean Maury, opponent’s mother died. That said note having been given, transferred and delivered to said Jean Maury, opponent’s father, for the use and benefit of his family, for the consideration and reasons stated, said Jean Maury, the day after the same was so transferred and delivered to him by Eugene Rabasse, and he had received and accepted its delivery and transfer at the time and place above stated, on or about the 2d of May, 1894, at their home on Bienville street, transferred and delivered the same to opponent, who accepted said transfer and delivery. That the consideration of said transfer and delivery by opponent’s father to her was in accordance with the expressed and unequivocal statement and intention of said Rabasse; that 'said note was given, transferred and delivered for the use and benefit of the family, and entertaining great affection and esteem for opponent, her father, Jean Maury, gave, transferred and delivered to her said note herein sued on at the time and place stated.
She reiterated ' all the allegations of the original opposition and prayed for judgment as prayed for therein.
On the trial of this opposition, the court of its own motion author *1410 ized opponent to amend her pleadings over an objection made by the executor and heirs, that any additional supplemental petition to change the issue was not authorized by law. The executor and heirs reserved a bill of exception. We do not find that opponent availed herself of her privilege, but testimony was permitted* to be introduced as if an amendment had been made.
In the opposition of Theodorine Belly, wife of Alphonse Foulquier, she averred that she was the holder and owner of a promissory note dated New Orleans, November 14, 1894, payable on demand, at the office of P. L. Fourchy, attorney at law, for value received, for the sum of twenty thousand dollars, with eight per cent, per annum interest from maturity until paid, which note was drawn and subscribed by E.' Rabasse to the order of Theodorine Belly, and the signature of said Rabasse to said note witnessed by P. Lavigne and L. Chambón.
In the opposition of Pierre Lavigne he averred that “he was the bona fide holder and owner of a promissory note, dated New Orleans, January 26, 1895, payable sixty days after date, to the order of opponent, for the sum of fourteen hundred dollars, with eight per cent, per annum from date, drawn by E. Rabasse.”
In the opposition of Albert Lavigne he averred that he was the holder of a promissory note, drawn by Dr. Eugene Rabasse January 4, 1895, due ninety days after date, in his favor, for the sum of eight hundred dollars, with eight per cent, per annum interest from date.
The Charity Hospital of the city of New Orleans claimed to be entitled to be placed on the tableau and paid ten per cent, on all sums, and on the value of all property to which the heirs and legatees of Dr. Rabasse, not domiciliated in the State of Louisiana, and not being citizens of any other State or territory of the United States, would be entitled, basing its demand upon the provisions of Act No. 1341 of 1894.
The claim was resisted on the ground that the heirs and legatees were protected from the tax by the stipulations of the Treaty of the United States with France.
The executor and heirs resisted the other oppositions by substantially the same defence as to all. They declared that they knew neither the handwriting nor the signature of the late Eugene Rabasse; that they believed, and therefore charged, that said pre *1411 tended notes were not in the handwriting of Eugene Rabasse, and that his name affixed thereto is not his genuine signature, and that said notes were never given to opponents by Rabasse, and they claimed and required strict proof of the writing, the signature and the delivery of the same. That if said notes were really written and signed by said Rabasse and were delivered by him to said opponents, then that they were given without any legal or sufficient consideration having been received by him or paid by opponents, and the .amounts thereof could not be demanded as a debt due by him or his .succession. That they can not be demanded as a donation, as the donation of a promissory note or of an incorporeal thing to be legal and binding must be by authentic act; that in the light of a disguised donation they were inoperative, null and void, either as donations inter vivos or mortis causa, as not being clothed with the forms required by law.
In the case of Miss Maury it was specially charged that the instrument upon which she declared, was not a promissory note to be governed by and entitled to the protection of the commercial law. That if it should be considered as an acknowledgment of indebtedness the true nature and origin of such pretended indebtedness should be alleged and approved aliunde, as well as all the circum - stances connected therewith.
The objection that the instrument was not a promissory note was leveled specially at the fact that the instrument by its terms was .payable to the order of the maker, and had never been endorsed by ■him.
ON THE OPPOSITION OP THE CHARITY HOSPITAL.
In the succession of Rixner, 48 An. 558, we examined and considered the legislation and jurisprudence of the State upon the subject of the taxation of foreign heirs, legatees and donees, from the time of the passage of Act No. 95 of 1828 (the first statute bearing upon that subject) down to and inclusive of Act 180 of 1894, the act •upon which opponent bases its claims herein.
Referring to the latter act we said that “ it followed the language of the repealed articles of the Oivil Code (Arts. 1221, 1222 and 1228) very closely, and that it declared the legislative purpose to be to revive the same; that the phraseology of the law was not accidentally employed, but it was manifestly employed with the purpose of keeping our law in line with the provisions of previously existing treaties, *1412 which are the- ‘ supreme law of the land’ (Sec. 2, Art. 6, United States Constitution) ; that ‘ the Act of 1894 reviving the articles of the Code, which had been repealed fifteen years previously, could not, in any event, have the effect of breaking the force of the repeated decisions of this court giving an interpretation to the law of 1842, which had been kept uninterruptedly in force until its repeal by the Legislature in 1877.’ ”
The parties interested in the Rixner succession were Italian-subjects, but in the examination of the legal questions involved in that litigation we incidentally considered the treaty between the government of the United States and that of France, using the following language:
“The following is an extract of the treaty proclaimed on the 12th-of August, 1853, viz.:
“ Art. VII. In all of the States of the Union whose existing laws-permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall have the right of possessing personal and real property by the same title and in the same manner as the-citizens of the United States. They shall be free to dispose of it as-tbey please, either gratuitously or for value-received, by donation, testament or otherwise, just as .those citizens themselves; and in no-case shall they be subjected to taxes on transfer, inheritance, or any others different from those paid by the latter, or to taxes which shall-not be equally imposed.” Treaties and Conventions, page 352.
“ The first sentence has exclusive reference to the right of Frenchmen ‘ to enjoy-the right of possessing personal and real property by the same title and in the same manner as the citizens of the United States,’ and the second declares that ‘ Frenchmen shall be free to-dispose of their property as they may please ’ and in no case shall they be subjected to taxes on transfer, inheritance or any others different from those paid by the latter, or to taxes which shall not not be equally imposed.’ ”
“ It is with the latter that we are alone concerned, as no question has been raised with reference to the right of Frenchmen to acquire and hold property in either of the States of the Union, and to that alone does the language of the treaty refer.”
In the Succession of Amat, 18 An. 405, where a claim similar to-the one advanced in this case was before the court as against French subjects, -the court, after quoting the seventh article of the treaty,, said:
*1413 “ The defendants claim to be exempt from paying the tax claimed under the authority of the treaty. This very identical question was decided adversely to the State (Mr. Justice Ogden dissenting) in the case of the Succession of Louis Dufour, 10 An. 391 * * * We have revised the decision of this court in the succession of Dufour, •and we are of the opinion that the court properly applied and correctly interpreted the seventh article of the treaty. Our laws have always permitted Frenchman to enjoy the right of possessing and owning property in Louisiana, and under the treaty of 1853 they can not be subjected to taxes on transfers, inheritance, or any others different from those paid by the citizens of the United States, or to taxes which are not equally imposed.”
The question of the liability of Frenchmen to the payment of an inheritance tax (levied under the act of 1855) arose in 1878, and was considered in the matter of the succession of the Marquis de Circé (Manning’s Unreported Cases, 412), decedent’s death having occurred in France in 1869. The court held that the act of 1855 was a revisory statute, which merely reiterated the provisions of the act of 1842, saying:
“ It formed a part of the general revisory legislation which has been had periodically in this State * * * It was simply a repro ■ duction of the laws of previous years, which had existed long anterior to the date of the (French) treaty. It was not a new enactment, etc., but a reproduction of the act of 1842.”
The French heirs were relieved from the payment of the tax on the authority of the Dufour and other cases cited. It is urged upon us that this last decision was by a divided court, and that we have ■before us what the former court did not have — a statute of Louisiana, enacted since the promulgation of the treaty and passed with direct reference to it, indicating unmistakably an intention and purpose on the part of the Legislature that its provisions should not thereafter have effect on successions in Louisiana.
It is contended that the Supreme Court of the United States, in Prevost vs. Grenoux, 19 Howard, p. 1, expressly recognized the power and control of the State Legislature over the operation of the treaty within the limits of the different States, when it made the following declaration:
“It is proper to say that the obligation of the treaty, and the operation in the State after it was made, depend upon the laws of *1414 Louisiana. The treaty does not claim for the United States the right of controlling the succession of real or personal property in a State; and its operation is expressly limited to the States of the Union whose laws permit it, and so long and to the same extent as those laws shall remain in force. And, as there is no act of the Legislature repealing this law and accepting the provisions of the treaty so as to secure her citizens similar rights in Prance, this court might feel some difficulty in saying that it was repealed by this treaty if the-State court had not so expounded its own laws and held that Louisiana was one of the States in which the proposed arrangements of the treaty were to be carried into effect.’-'
Our attention is called to the fact that the majority of the court in the matter of the succession of De Oircé declared that this was not an obiter, but, on the contrary, an intimation of the most direct kind that courts ever give, that the United States Supreme Court did- not think the treaty applied to successions in Louisiana, and only held that it did because the State court had so held.
It is true that that statement was made, but the court, none the less, went on to say that “-the Dufour case was decided in 1855 and that of Prevost in 1857, and in interpreting the article of the treaty and its effect on our law imposing the tax we should, in a case of doubt, more readily follow a decision of this court rendered so long as twenty-four years ago than an intimation of the national court that the decision should have been the contrary.”
Counsel in the De Circé case pressed very strongly upon the court that since the rendering of the decisions, to whose conclusions it so declared its adherence, a change in the situation had taken place, resulting from the fact the Legislature had, by positive enactment of a date later than that of the treaty ^imposed an inheritance tax on aliens; that this last statute was passed with direct reference to the treaty, and indicated an unmistakable intention on the part of the Legislature to counteract the effect of prior decisions of the court and an unmistakable purpose that the treaty provisions should no longer have effect on successions in Louisiana. That the Legislature had therein attempted to exercise and did exercise its reserved power of control (recognized by the Supreme Court of the United States) over the subject matter. In spite of this contention the court maintained and followed prior decisions. Counsel in the present case say that this was because the court was of the opinion *1415 that the statute (therein referred to as the last statute) was not a new enactment, but the old statute placed in its proper place as part of a revisory grouping of existing laws, but we think undue weight is attached to the statement that the statute was not a new one. What the court obviously meant was that it contained no new matter; that it was precisely the same legislation which our courts had on several occasions before compared with the provisions of the treaty and declared insufficient to save the tax imposed through it from falling under the inhibition of the provisions of the treaty.
In the Rixner case we made a similar comparison and found that no alteration had been made in the character of the legislation as it existed at the time of the decisions referred to; that the only thing that could be said was that there had been in 1894 a substantive, direct revival of the prior legislation which had been in 1877 repealed in express terms. We find matters, therefore, standing just as they stood before.
The statement made in the Amat succession that “ our laws have always permitted Frenchmen the right of possessing and owning property in Louisiana ” is as unquestionably, correct now as when made. There has been no attempt on the part of the General Assembly to withhold from Frenchmen “the right of possessing and owning personal and real property by the same title and in the same manner as the citizens of the United States.” Their right to inherit is as absolute, unconditional and untrammeled as it was before the statute of 1894. What that statute attempted to do was not to make the right of inheritance contingent upon the payment of a tax, but to make the payment of a tax follow and result from the vesting of the title to the property. Such was the opinion we expressed in the succession of Pablo Sala, recently decided, and we see no ground for changing our views on that point. There is a great difference between a grant dependent for its existence upon conditions or contingencies or voidable on conditions or contingencies, and a grant of absolute ownership to be followed by limitations, conditions or charges as incidents of such absolute right of property. The Legislature of this State may have the right of prohibiting Frenchmen from possessing personal and real property by the same title and in the same manner as the citizens of the United States, but if it has such right it has not as yet thought proper to exercise the same, but, on the contrary, it has permitted them, up to the present time, to stand *1416 in that respect on the same plane as do our own citizens. Occupying that status, the treaty provisions declare that in no case shall they be subjected to taxes on transfer, inheritance, or any other different from those paid by our own citizens themselves, or to taxes which shall not be equally imposed (Succession of Rixner, 48 An. 558). We are of the opinion that this opposition was properly rejected, and so decree.
ON THE OPPOSITION OF THEODORINE BELLY, WIEE OE ALPHONSE eoulquier.
At the time the instrument upon which opponent declares was dated she was the proprietor of a cigar store at the corner of Royal and St. Peter streets, and occupied a room, directly over the same as a residence. The deceased (Dr. Rabasse), an old man over 80 years of age, lived on the opposite side of Royal street. Pierre Lavigne, whose name appears on the back of the instrument as purporting to have been a witness (together with one Louis Chambon) to the signature to the note, was employed by Rabasse in the collection of the rents of several houses belonging to him, and lived in the same building with him.
Lavigne’s account of this instrument is that on the 14th of November, 1894, Rabasse called at witness’ room, saying there to him: “ Lavigne, I need you — come down stairs with me;” that at this request he accompanied him to opponent’s cigar store, where they met opponent and Chambón, and the four proceeded together to opponent’s room; that there, Rabasse having this instrument in his possession already written out and signed, handed it to Mrs. Belly, saying either: “ I give you this note,” or “ I give you that for a consideration;” that at the request of Rabasse he and Chambón placed their names on the back of the note as witnesses; that he knew Rabasse’s handwriting; that the signature to the note looked like his signature, but he could not swear to it; he did not see him sign the note; he saw Chambón when he signed his name to it; that Chambón had been drinking, but was not drunk; that the note declared upon was the identical instrument he saw Rabasse hand to the opponent.
Chambón, when placed upon the stand, denied all knowledge of the transaction, though he acknowledged the genuineness of his signature on the back of the note; he intimated that he must have *1417 been very drunk on the occasion, as everything connected with the . subject had, disappeared from his memory. He declared that he had never seen Rabasse sign his name; that he did not know his handwriting, and did not know whether the signature to the note was Rabassé’s or not.
One Mrs. Scott, who occupied a room in the same building with opponent, testified to having seen Rabasse, Lavigne, Chambón and opponent go together to the latter’s room about the date given to the note.
Paul L. Fourehy stated that the body of the note was written by him at the request of opponent. He sai°d she asked him to draw it up so as to have it in legal form; that he also wrote the words on the back of the note, “Witnesses to signatures;” that at the time he did so he knew nothing about it and had no idea who was to sign it. The note evidently must have been handed by Mr. Fourehy to opponent, but what became of it afterward until Pierre Lavigne testifies to its being in the possession of Dr. Rabasse in Miss Belly’s room does not appear.
Opponent did not take the stand to explain how or by reason of what facts or circumstances she became the holder of the instrument. We are entirely in the dark as to the relations between opponent and Rabasse prior to the date of the instrument. There is nothing to show relationship, affinity or antecedent friendship or intimacy of any kind between the parties, and nothing to support a consideration for the note, other than the words, “ value received,” contained in the instrument itself. Opponent is shown to have been engaged shortly before this note was given, as a dancer at the Eden Theatre, from which there is a fair inference that she was not a woman of means. The genuineness of the signature ofRabasse to the instrument sued on was not only expressly put at issue by the pleadings, but the evidence taken on the trial was of a character such as to create the gravest suspicions on that subject. In disposing of this opposition the District Judge said: “ I think the opposition of Mrs. Foulquier on a note for twenty thousand dollars is not supported by proof. There could have been no adequate consideration under the facts established conceding the note to be genuine.”
We are of the opinion that the claim was rightly rejected, and the court’s action in so disposing of it is affirmed.
*1418 ON THE OPPOSITION OP PIERRE LAVIGNE.
Opponent is the same person whose name appears on the back of the note declared on by Mrs. Foulquier. The signature to the note he declares on was called in question by the pleadings. Of this opposition the District Court said: “The claim of P. Lavigne on note of fourteen hundred dollars is overcome by the weight of adverse proof, and will be dismissed with costs.” We see no good to be subserved by reproducing in this opinion the testimony touching the genuineness of Rabasse’s signature to the instrument declared on, nor that relative to the possession by the opponent of a second note purporting to have been made in opponent’s favor by the deceased, whose appearance and disappearance is referred to by witnesses in the record.
We are of the opinion that the court’s action in rejecting this opposition was correct and it is affirmed.
ON THE OPPOSITION OE MISS MAURY.
Of this opposition the District Court said:
“ The writing sued on by Jeanne Maury, for twenty-five thousand dollars is not a note, nor a donation. It was executed by the deceased and given to the father of opponent, I take it, as an acknowledgment of his desire that Maury and his family should be beneficiaries of his estate in consideration of many kindnesses shown by them to him. It would not be fair to the estate to give opponent twenty-five thousand dollars, but I do not think it would be fair to give her nothing and burden her with the costs of her opposition. While there are no definite data as to the quantum I think that five hundred dollars may be equitably and legally awarded in opponent’s favor as the assignee of her father, to whom deceased delivered said document (16 An. 222, 544; 29 An. N. R.; Succession of Lacroix, Louque’s Digest, page 85, No. 22).”
The instrument on which the opposition is based is as follows:
Nouvelle Orleans, ler Mai, 1894.
Une année apres date, je promets de payer a mon propre ordre la somme de vingt cinq mille piastres pour valeur repue avee interéts a huit pour cent par an, a partir de cette date, jusqu’a parfait paiement.
$25,000. (Signed) E. Rabasse,
*1419 Or, in English:
New Orleans, 1st May, 1894.
One year after date I promise to pay to my own order the sam of twenty-ñve thousand dollars for value received, with interest at eight per cent per annum from this date until perfect (or full) payment.
§25,000. (Signed) E. Rabasse.
It is not claimed that this instrument was ever endorsed by E. Rabasse, but it is alleged that it was delivered in person by E, Rabasse to opponent’s father, Jean Maury, for a valuable consideration, as mentioned therein, and that opponent acquired the same from her father for a valuable consideration.
Opponent argues the case as being identical with what it would have been had the instrument been made payable by the maker to the order of Jean Maury, and he, without endorsing it, had transferred it verbally and by delivery to herself.
Jean Maury testified that he was chief cook at Kuntz’ and other first-class establishments in New Orleans fora great many years; that during that time he and Dr. Rabasse were on \¿ery intimate terms, he being a constant visitor at his house, taking meals there repeatedly, and going there as to his own home — that he manifested' great appreciation of the manner in which he was treated,, and often said that he would not forget him and his family;, that the last time he did so was when he handed him the note on which suit was brought. That the circumstances under which he obtained the note were these: On the Sunday prior to receiving it Rabasse dined at his house, and told him that he must go with his daughter to see him at his house; accordingly on the Tuesday following he and his daughter went as requested. Being there Rabasse, in the presence of Pierre Lavigne, handed him the note, saying “ Here is for all the good that you have done for me.” The note sued on is that which Rabasse handed him. Witness gave the note the next day to his daughter for fear some accident should happen to him, and he did not kuow what would be the result. As Rabasse gave it to witness’ family, he gave it to his daughter. Witness’ wife was dead at the date of the note. At the time and place mentioned Rabasse took the note already written from his pocket-book and handed it to witness in presence of Lavigne and witness’ daughter. They found Rabasse and Lavigne together at the former’s house— *1420 Rabasse was at work doing something when witness and his daughter entered. When he handed witness the note witness thanked him; he answered: “I give you but what you deserve for all the good you have done me from the time I have known you.’? Witness did not examine the note when it was handed him, but took it, glaneed at it, put it in his pocket. He turned it over to his daughter because he was an old man, and the note was given for the family. His daughter paid him no money for it. Rabasse went to his desk, opened it, took out his. pocket-book, opened it, and handed witness the note. This was done after some little conversation with us. He said: I asked you to come here; I want to give you this.” Mr. Rabasse was not sick at the time; he was in good health. Witness never sent any bills to Rabasse for the meals he had taken at Ms house; he looked upon him as a friend always; he never asked any permission; he came there as if it was his house. Witness frequently did deceased acts of kindness; loaned him small amounts without interest, and sold some of his property without commissions.
Miss Maury’s testimony conformed substantially to that of her father. She said that Rabasse always said he wanted to do something for them, and that upon the Sunday in question he told her father and herself to go to his house on Tuesday, and they did so, as stated by her father. That after they entered Rabasse went to his desk, opened a porte-monnaie, took out of it a note and handed it to her father, saying: “ I give you this note in consideration of all the good; you have been kind to me — for you and your family.” Her father and she herself thanked him. She had known Rabasse from her childhood. He was very intimate with her father’s family ever since she was a child; dined there repeatedly during that whole time, sometimes twice a day. Her father gave her the note, as it was given for the family, because he was an old man and some accident might happen to him. Dr. Rabasse was a good, kind friend, and her father had been a good, kind friend to him. She admitted that Dr. Rabasse gave the note to them for kindness to him. Her father had loaned Dr. Rabasse seventy-five or a hundred dollars that he never returned to him.
Charles Heyob testified to the. long intimacy between Rabasse and Maury and his family. He said that Rabasse was a pretty “ close” man.
Michel Variol said he had seen the note sued on iu Rabasse’s pos *1421 session; that about the end of April, 1894, he met Rabasse on Royal street. The latter had often told witness that he was going to make something for Mr. Maury. On that occasion he stopped Mm, saying: Oh, let me show you what I prepared for my friend, Mr. Maury.” He then took the note from his pocket, where he had it among other papers, and showed it to witness; witness read and returned it; it was written in English. He, a few days afterward, saw the same note in the possession of Miss Maury. The note was for twenty-five thousand dollars. ' The Maurys had boarded at his house for several years. The relations between them and Rabasse were intimate. Witness did not know in whose handwriting the note was. The note was payable, he thought, one year after date, to the order of the drawer. He did not know whether it was endorsed or not. The conversation between Rabasse and witness about the note was a short one; only they two were present. On the day after this witness had testified he appeared in court and asked to eorreet that portion of his testimony wherein he had stated, in errort that the note was written in English; that the fact was that the note was written in French. One of Miss Maury’s attorneys had said to him as he was leaving the court house that he had testified that the note was written in English, and he had replied that could not be as it was written in French.
Juste Fontaine testified to the intimacy between Maury and his family and Rabasse. He said that Rabasse was quite a wealthy man, but he never had any money, and it was almost impossible to do business with him; that he was stingy; he promised plenty, but gave nothing.
Pierre Lavigne testified that he was present at the interview of the 1st of May, 1894, between Maury and his daughter and Rabasse. He saw the latter take the note from his bureau or desk to give it to Mr. Maury. In giving it he said in French “ he gave that note for consideration to support his family; they were good friends a long time, and he gave that to his family to support.” “ I give you that note as a consideration for your family.” The note sued on is the one handed by Rabasse to Mrs. Maury. Maury thanked Rabasse and nothing more was said. The relations between the parties were intimate. On cross-examination, he said he had never se.enthe note before it was taken out of the desk and handed to Maury, nor had he seen it since. That he looked at it when given to Mr. Maury. That *1422 the note was read aloud by Dr. Rabasse to Mr. Maury and witness beard it read. That he did not know in whose handwriting the note was. It was already prepared.
The District Court dealt with the instrument sued on as one signed by the deceased, though several witnesses testified that the signature thereto of Dr. Rabasse was not genuine. In reaching the judgment it did, the District Court evidently threw aside the note as having been the basis on which the demand was made, and utilized it solely as evidence in aid of the rightfulness of an equitable claim by Maury and his daughter for a moneyed recognition at the hands of the succession and heirs of Dr. Rabasse for services rendered, acting, we presume, under the authority of the doctrine announced in the Succession of Fowler, 7 An. 207. Danenhauer vs. The Succession of Brown, 47 An. 342; The Succession of McNamara, 48 An. 45; Succession of Kreckeler, 44 An. 728; Gurley vs. The City of New Orleans, 41 An. 79.
The syllabus in the Succession of McNamara, 46 An. 45, reads as follows: “ Where services are rendered of a valuable nature in the expectation of being remunerated in the will of the person to whom they are rendered, and an implied promise to that effect has been held out to the- party performing the same, and he is not mentioned in the will, he will be entitled to reasonable compensation out of the estate of the deceased.”
Counsel of Miss Maury contends that the moment the District Court conceded that the instrument sued on was executed by Rabasse, and that it recognized an obligation on his part to pay the amount therein mentioned as being “ for value received,” it furnished a conclusive estimate by the party himself who received the services for which the note was given of their value, inasmuch as the deceased left no forced heirs and there is no charge of fraud or error inducing the promise. That the court could not substitute its own standard of value for that of Rabasse. They say “all that was necessary for them to establish was that there was some consideration, and no matter how greatly disproportionate to the amount of the note the consideration might be, the note for that reason could not be disallowed, but must be allowed in full.” They cite in support of this position Earl vs. Peck, 64 N. Y. 596, in which the court said: “ Mere inadequacy of consideration, except as a circumstance bearing upon the question of fraud or undue influence, is not a *1423 defence to a note. It is not necessary that the consideration of a note shall be equal in pecuniary value to the obligation incurred. If no part of the consideration was wanting at the time and no part of it subsequently failed, although inadequate in amount, the note is a valid obligation, while a want or failure of consideration, in whole or in part, is a good defence to the whole note or to the extent of such failure.” Johnson vs. Titus, 2 Hill, 606; 21 Wend. 568. “ This case in its principal features is quite analogous to the case of Worth vs. Case, 42 N. Y. 362. There, as here, the note expressed the consideration to be for services rendered, and although the amount was more largely in excess of the pecuniary value of the services than in this case, the action was sustained by the court and the reasoning in the opinions is applicable to the facts of this ease. If the intestate chose to pay for the services rendered a much larger sum than they were worth, he had the right to do so. The note was not a gratuity or gift. There is no standard whereby courts can limit the measure of value in such case, and an obligation is not wanting even partially in consideration because the value is less than the obligation. A note for a thousand dollars given for a horse confessedly worth but one hundred can not be successfully defended on the ground of a want of failure of “ consideration.” Counsel refer us also to Nye vs. King’s Estate, 54 N. W. 178; Boggs vs. Wann, 54 F. 681; Root vs. Strong, 28 N. Y. Supp. 273; Diffendafer vs. Scott, 32 N. E. Rep. 87, and to our own decision in Barthe vs. Succession of Lacroix, 29 An. 326. The plaintiff in the latter case, who had been a trusted employee of the deceased, sued the succession of his late employer on a note for five hundred dollars, and was met by the defence that the note was without consideration and that it was at best a disguised'donation void for want of form. The evidence established that several years before his death, La-croix being in ill health, sent for two of his friends, told them he felt under obligations to plaintiff and directed to be drawn up and attested by them a note in plaintiff’s favor for five hundred dollars, payable at Lacroix’ death. This note so signed was delivered to plaintiff. The court in its opinion said: We have read all the evidence carefully and the conclusion we have reached is, that the deceased Lacroix-being without family and believing that plaintiff had served him long and faithfully at very small wages, felt that he was under a moral obligation to remunerate him beyond his wages *1424 and executed this five hundred dollars for that purpose. In one sense it was a gratuity — i. e., he was under no legal obligation to do so. In another sense it was the fulfilment of a natural obligation. We think there was a good and valid consideration for the note. Under this view, it becomes unnecessary to pass upon questions raised as to the validity of disguised donations under the form of onerous “contracts.”
We agree with the District Court that the instrument declared can be sustained neither as a contract to do nor a contract to give— neither as a note nor as a donation. The instrument by its very terms shows that it was contemplated that an additional act would have to be performed in order to make it, as such, a perfected instrument (C. C. 1905, 1906). An instrument by which the maker engages to paly a certain sum of money on the order of the maker, which has never received the endorsement upon the fact of which endorsement alone a promise of payment had been made, is incomplete, and in that condition could not, as a note, be enforced against the maker. Delivery by the maker to a particular person, even though accompanied by words indicative of a gift or donation of the same, does not stand in lieu of, is not a substitute for, nor is it the equivalent of an endorsement. The situation does not correspond at all with that of the delivery of a note by the person to whose order it was payable, to a third person, accompanied by words of assignment but without endorsement. In the one case there would be a verbal assignment of a perfected thing; in the other, of a thing which would pass into the hands of the party who had received it with something requiring still to be done to give it existence. While the instrument can not be made available as a note, still less can it be claimed to be enforceable as a donation or gift. At best it can be considered as evidencing a mere promise to give at a future time upon the condition of a subsequent endorsement by the promisor. There was no particular object or specific thing of which the maker of the instrument by means thereof divested himself irrevocably, and at once, in favor of the party receiving it. ’ The instrument never took such shape as to be classified as a “ thing,” and to be susceptible of being donated or given as such. It represented at the utmost a mere promise, a conditional promise when made, and now an unfulfilled conditional promise not capable of enforcement. If the maker had executed a note payable to his own order, had endorsed it in blank and had *1425 handed it to Maury, it might possibly have resisted an attack upon it as to form ; but that is not the case before the court. As matters stand the instrument declared on is fatally defective, viewed either as a note, a donation proper or as a remunerative donation. A party contemplating making a donation must see to it, whatever be the act or instrumentality which he proposes to employ as the medium for carrying out his intentions, that it fulfils, in itself, all the conditions of regularity required to give efficacy to that particular act.
“ Il faut,” says Dalloz and Vergé (Code Civil Annoté, under Art. 931 C. N., No. 105), “ que le contrat sous lequel la donation a été deguisée remplisse lui meme considéré abstractivement toutes les conditions de régularité prescrite par la loi particuliere quilerégit” (Req. 1er, Fevrier, 1842; J. G. Disp. Entre Vifs, 1673 et 1670).
“ Par exemple si le donateur a émprunté la forme d’un acte de vente ou de transport il faut, a peine de nullité, qu’on n’ait omis les caractéres constitutifs de ces sortes de convertions. Sile donateura préferé la voie de l’endossement il faut d’une part que l’objet, objet de la donation, soit negociable de sa nature et se préte á ce mode de transmission; d’autre part que l’endossement soit régulier ” (J. G. Disp., entre vifs 1673).
Article 1905, C. C., declares that the term “ to give ” is applied only to corporeal objects that may be actually delivered from one to another, and includes the payment of money as well as the delivery of any other article. A covenant respecting an incorporeal right comes under the definition of contracts to do or not to do, because some act besides that of delivery is necessary for the transfer of such rights,” and Art. 1906, that “ a contract for the delivery of a promissory note payable to bearer, or payable to order, and already endorsed, or any other negotiable paper of the same nature also endorsed or transferable by delivery only, comes under the description of a contract to give, but a contract to transfer a note to order not endorsed, or any other debt that requires an act of transfer, is an obligation to do.”
We are of the opinion that the demand, in so far as it seeks a judgment in this case as being based upon the instrument referred to as the cause of action, can not be sustained.
We are next to inquire whether the judgment can be affirmed by considering the demand as one for services rendered to the deceased, *1426 sustained, as to evidence, through the instrument referred to as an acknowledgement by the deceased. The services rendered are of a kind entirely different from those considered in the matter of the Succession of McNamara, 48 An. 45; the succession of Powler, and others cited. They are not such as from their character would imply or give rise to an expectation on the part of those who rendered them that they would be remunerated, nor on the part of those who received them that they would be called upon to do so. They were merely the customary, almost necessary, incidents which result from a close intimate relation between parties — services leading up to affection and friendship, and the performance of reciprocal services, but not to payment in money. They are services which do not give rise to debt or to remunerative donations, but might very legitimately and naturally give rise to donations proper. Maury and his daughter very irankly state what their character was. Had the instrument declared on been endorsed by Rabasse and then delivered to Maury it would not, in our opinion, have evidenced either a debt or a remunerative donation, but a donation proper in the form of a note, and if it could have been sustained in that form (as to which we express no opinion) it would have been so, not because it was a remunerative donation, but because a donation proper could have been made in that form, and under these conditions and circumstances. We do not think the services here give rise to a cause of action, nor that the situation is aided through the acknowledgment supposed to be contained in the instrument declared on (C. C. 1773; Adams vs. Succession of Mills, 49 An. 795). The moment that instrument failed to carry out its purpose by force of its own terms, it failed to have any legal efficacy. We are powerless to take it as a standard of value. It is a well-known fact that services of the most trivial character sometimes by reason of the special circumstances under which they are rendered so impress the imagination and the heart as to carry with them permanent friendship, under the influence of which immense fortunes are bequeathed to those who were fortunate enough to have raised such feelings on account of them. It would be utterly wrong to refer bequests of that character to remuneration for services rendered, or to test the value of the services by the amount of the legacy. In the case at bar there is no standard by which, and no evidence through which, could be gauged a right to remuneration even if that right existed.
*1427 We think the court erred in rendering judgment in favor of this opponent for five hundred dollars. The opposition should have been entirely rejected. It is therefore ordered that the judgment of the District Court, in the matter of the opposition of Miss Marie Alexandrine Maury, be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that her opposition be rejected, with costs in both courts.
ON THE OPPOSITION OP ALBERT LAVIGNE.
This opposition was sustained to the extent of three hundred dollars. After judgment to that effect had been signed, counsel of Albert Lavigne served a rule on the executor to show cause why the judgment should not be amended so as to increase the amount to eight hundred dollars, it being suggested that the court had intended it to be for that sum, but had inadvertently fixed it at three hundred dollars. The executor objected to any change at that time and in that manner, though the court declared that the recitals of the rule to amend the judgment were correct. In consequence of this objection the court refused to amend and Albert Lavigne appealed.
There is some doubt in our mind as to whether stronger evidence should not have been furnished on this claim than opponent presented, but the doubt is not sufficient to cause us to reverse the judgment or remand the cause. The District Judge who saw the witnesses was of the opinion that the opposition was well grounded and we are not prepared to say that it erred in reaching that conclusion. On that theory the judgment should have been for eight hundred dollars instead of three hundred dollars.
For the reasons herein assigned it is ordered, adjudged and ■decreed that the judgment of the District Court on the opposition of Albert Lavigne be amended by increasing the amount adjudged to him to the sum of eight hundred dollars, with eight per cent, per annum interest thereon from January 1, 1895, until paid, and costs in both courts. It is further ordered, adjudged and decreed that the judgment of the District Court on the opposition of Miss Marie Alex-andrine Maury be and the same is hereby annulled, avoided and ■reversed, and it is now ordered, adjudged and decreed that said ■opposition be rejected, with costs in both courts. It is further ordered, adjudged and decreed that the judgment appealed from, except in so far as amended and reversed above, be and the same is hereby affirmed, at appellants’ costs.