899 So.2d 658 (2005)
SUCCESSION OF J.C. Wilmer RHODES, Sr.
No. 39,364-CA.
Court of Appeal of Louisiana, Second Circuit.
March 23, 2005.
*659 James E. Bolin, Jr., Shreveport, for Appellants, Charles Magers and Kathryne Magers.
Jeffrey S. Cox, Rita K. Bacot, for Appellee, Estate of J.C. Wilmer Rhodes, Sr.
Joseph R. Gilsoul, Brian D. Landry, Shreveport, for Appellee J.C. Wilmer Rhodes, Jr.
William A. Pesnell, for Intervenor, Judy Harrison.
Before BROWN, WILLIAMS and GASKINS, JJ.
WILLIAMS, Judge.
The petitioners, Charles Magers and Kathryne Magers, and the intervenor, Judy Harrison, appeal a summary judgment rendered in favor of J.C. Wilmer Rhodes, Jr. ("Rhodes, Jr."). The district court denied the motions for partial summary judgment filed by the Magers and Harrison. For the following reasons, we affirm.

FACTS
In March 2003, the decedent, J.C. Wilmer Rhodes, died at the age of 88 in Shreveport, Louisiana. The decedent's wife had died several years earlier and he was survived by his only child, Rhodes, Jr. Decedent had executed a will in notarial form in August 2000, leaving his entire estate to the trustee of the J.C. Wilmer Rhodes and Carolyn Rhodes Revocable Living Trust. Rhodes, Jr. obtained a district court judgment, probating the August 2000 will and naming him as the executor of the succession.
In July 2003, Charles Magers, the decedent's nephew, and his wife Kathryne ("the Magers"), filed a petition to annul the decedent's August 2000 will and to probate a February 23, 2003 writing of decedent as a valid olographic will. Alternatively, the Magers sought to probate a February 21, 2003 writing by decedent as a valid olographic will. The 2/23/03 document is a handwritten letter from the decedent to attorney Pete King. The 2/21/03 document consists of decedent's notes written in a DayTimer notebook. In August 2003, Judy Harrison filed a petition of intervention asserting a contractual claim of $50,000 against the succession of Wilmer Rhodes and any rights she may gain as a legatee if either the 2/23/03 letter or the 2/21/03 writing were recognized as decedent's olographic will.
Subsequently, Rhodes, Jr. filed a motion for summary judgment seeking a ruling by the district court that the February 2003 writings were not valid olographic wills. The Magers and Harrison filed motions for partial summary judgment seeking recognition of either the 2/23/03 letter or the 2/21/03 writing as decedent's valid olographic will.
After a hearing on the motions, the district court issued oral reasons for judgment finding that neither of the decedent's February 2003 writings expressed a testamentary intent and thus were not valid olographic wills. The court found that the 2/21/03 writing contained decedent's notes to himself regarding points to discuss with his attorney and that the 2/23/03 letter to attorney King stated a "set of instructions regarding the future preparation of another will." In three separate judgments, the district court granted summary judgment in favor of Rhodes, Jr. and denied the motions for partial summary judgment by the Magers and Harrison. The court certified the summary judgment in favor of *660 Rhodes, Jr. as a final judgment under LSA-C.C.P. art. 1915. The Magers and Harrison appeal this judgment.

DISCUSSION
The Magers and Harrison contend the district court erred in granting summary judgment in favor of Rhodes, Jr. They argue that the decedent's handwritten document of February 23, 2003, or alternatively, that of February 21, 2003, expressed the requisite testamentary intent to constitute a valid olographic will.
There are two forms of testaments: olographic and notarial. LSA-C.C. art. 1574. An olographic testament is one entirely written, dated and signed in the handwriting of the testator. LSA-C.C. art. 1575. The only additional requirement is that the document itself must evidence testamentary intent to be a valid testament. Succession of Mott, 97-1419 (La.App. 3rd Cir.7/8/98), 715 So.2d 1258. In the absence of a testamentary intent, there cannot be a will. Furthermore, such intent must exist when the instrument is executed and must apply to the particular instrument produced as a will. A paper is not established as a person's will merely by proving that he intended to make a disposition of his property similar to or even identically the same as that contained in the paper. It must satisfactorily appear that he intended the very paper to be his will. Succession of Patterson, 188 La. 635, 177 So. 692 (1937); Succession of Plummer, 37,243 (La.App.2d Cir.5/14/03), 847 So.2d 185; Hendry v. Succession of Helms, 557 So.2d 427 (La.App. 3rd Cir. 1990).
In the present case, we will initially address Harrison's contention that the district court erred in considering her employment contract with decedent in determining whether the contested documents reflect a testamentary intent. As stated above, the courts should examine the language used in the particular instrument produced as a will in making its determination concerning decedent's testamentary intent. Even if we were to assume that the district court erred in considering the employment contract provisions with respect to the issue of decedent's testamentary intent, our inquiry would not be resolved. The issue before this court remains whether the language of the contested documents clearly indicates that the decedent intended to dispose of his property upon his death by means of these particular instruments. First we will consider the decedent's notes written in the DayTimer.

Notes of February 21, 2003
The decedent's DayTimer notes primarily describe the actions he had taken on his son's behalf during his life and express his disappointment at his son's failure to appreciate those efforts. The writing indicates the decedent's desire to "ask" attorney King to be his advisor, to remove his son as administrator of his estate "after I either pass away or am no longer in possession of my faculties" and to "summarize" his feelings at that time. These statements show that decedent did not intend to dispose of his property at death by means of this instrument. In particular, decedent's statement that he wanted his son "shut out of my will" is evidence that he did not intend this document to be his last will. Considering the DayTimer writing as a whole, we conclude that the language of the document does not demonstrate testamentary intent by the decedent. Thus, the DayTimer notes did not constitute a valid olographic will.

Letter of February 23, 2003
The other document at issue is in the form of a letter directed to attorney King, *661 that was written, dated and signed by the decedent and reads as follows:
2/23/03
Dear Pete:
This may seem like I am being hard on my only son of 54 years, but as I have explained to you, he has greatly disappointed me. This may be my last attempt to explain my last desires to you. Please take all my stock holdings and IRA's in the two fire-proof cabinets to Mr. Vincent James my C.P.A. and have him evaluate my entire estate, pay my taxes and calculate the conservative value of my entire estate. As I instructed earlier I wish you to take action legally of removing my son, J.C. Wilmer Rhodes, Jr., from all all [sic] access or inheritance privileges I have previously conferred upon him. I wish him to be legally restricted from ever entering my home again, removed from the P.O.A. I conferred upon him and all the privileges it confers. I would like you to assume the role of Administrator after my death with complete autonomy in all my matters of business.
I would also ask you take immediate legal action, not only to deny my son access to my home but to deny him from taking any property, mine or what he claims as belonging to him. When he left, he and his wife practically emptied all drawers and cabinets from some dishes, pictures belonging to Carolyn, my deceased wife, and many objects belonging to me and his mother. I don't want him allowed into the home I had planned to leave him at my death.
Then, I request that you cancel legally all previous wills, which I planned to use to make sure he got all I possessed at my death and accomplish the following for me: (1) the investigation I had run on Ms. Judy Harrison was done at your suggestion and to reassure my son that she was a beautiful person, to me, and maybe it would reassure him about him[sic]. If it proves clear to you I wish you to see that Ms. Judy Harrison receives one half my estate which will include my home and never finds out about the background check. One half my estate I would like to be given to Mr. Charles "Chuck" Magers and his wonderful wife Kathy Magers, both who have always treated me with respect and love, especially in this moment of dire need when my son and his wife abandoned me.
I am now firmly convinced my son is completely incapable of ever realizing the the [sic] deep mental anguish he has caused me, and even if he did, he would be incapable of admitting an error he made.
Pete, I have always admired your attitude, your accomplishments and I value your friendship greatly and always will. I know your sense of Justice would never allow you to act in any other ethical way other than loyalty to your client, even though Sonny has been a lifelong friend. That's why I feel not the slightest qualm in entrusting you to administer my entire estate. Thank you so much for being such a fine man to entrust this to you to finalize my last wishes.
J.C. Wilmer Rhodes, D.V.M.
After reviewing the February 23, 2003 document, we note that decedent begins the letter by stating that it is an "attempt to explain" his "last desires," rather than saying the instrument is his last will or a disposition of his property. In several instances, decedent instructs the attorney to "take action" to remove his son as administrator, to terminate the power of attorney to his son and to take "immediate legal action" to prevent the son from entering decedent's home and *662 from removing property. Such instructions are not consistent with a situation where decedent intended to convey his property by means of this particular instrument. Rather, the statements demonstrate that decedent expected the attorney to prepare an additional document to carry out his wishes.
The Magers in their brief contend that these instructions would apply only after decedent's death, since he could prevent the son from entering the home if he were alive. However, contrary to the Magers' contention, the record shows that Rhodes, Jr. had previously removed property from his father's house while decedent was living in the home. The decedent's statements equally reflect a desire that the attorney initiate legal process restraining Rhodes, Jr. from entering the home and removing property during decedent's lifetime.
In addition, the decedent's inclusion in the letter of the following statements, his request to the attorney that "you cancel legally all previous wills," his wish that the attorney "see that Ms. Judy Harrison receives one half my estate" and that he "would like" one-half of his estate "to be given" to the Magers, further demonstrate the decedent's expectation that the attorney would prepare another instrument as his last will. The decedent's statements that he would like the attorney "to assume the role of Administrator after my death" and "to finalize my last wishes" are similarly consistent with a determination that decedent did not intend this writing to be his last will, which in his view, as indicated by the language employed, had yet to be finalized.
After carefully considering the document as a whole, we must conclude that the decedent did not intend to dispose of his property upon his death by means of this particular instrument. In the absence of such testamentary intent, the document presented for probate did not constitute a valid olographic will. Consequently, the district court did not err in granting summary judgment in favor of Rhodes, Jr. The assignments of error lack merit.

CONCLUSION
For the foregoing reasons, the district court's summary judgment in favor of J.C. Wilmer Rhodes, Jr. is affirmed. Costs of this appeal are assessed to the appellants, Charles and Kathryne Magers and Judy Harrison.
AFFIRMED.