DREW, J.
C Judy Harrison appeals the denial of her intervention in which she sought to enforce an “employment contract” against the Succession of J.C. Wilmer Rhodes, Sr.[1] The contract was executed 42 days before the decedent’s death. For the following reasons, the judgment of the trial court is affirmed.
FACTUAL AND PROCEDURAL BACKGROUND
Dr. Rhodes was a veterinarian who died on March 26, 2003, at the age of 89. He was survived by his only child, J.C. Wilmer Rhodes, Jr., who was qualified as executor of the estate. The succession probated a statutory testament dated August 20, 2000.
Dr. Rhodes suffered some debilitating events during his last years, including the following:
• after over 50 years of marriage, the death of his wife in 2000;
• the deterioration of his mental and physical faculties, beginning in 2002;
• the loss of his driving privileges; and
• a disabling fall in his back yard.
This lonely elderly man needed transportation and daily care, which he received from his son and daughter-in-law. They initially lived adjacent to Dr. Rhodes in an RV and later lived in his home with him.
Dr. Rhodes began surfing the Internet, where he made contact with a dating service, through which he met Judy Harrison, who was more than 30 years younger than Dr. Rhodes. In the approximately three months preceding Dr. Rhodes’ death, the relationship became sexual in nature. IgUpon the death of Dr. Rhodes, Harrison first intervened and asserted that some of his pos1>-2000 writings should have been construed as olographic testaments in her favor. The trial court and this court rejected -these claims. See Succession of J.C. Wilmer Rhodes, Sr., 39,364 (La. App.2d Cir.3/23/05, 899 So.2d 658), units denied, 05-0936 (La.6/3/05), 903 So.2d 459; 05-1044 (La.6/3/05), 903 So.2d 460.
Harrison then amended her intervention to enforce the document styled “Employment Contract” executed on February 12, 2003, six weeks before Dr. Rhodes’ death. This amended intervention was opposed by his son, individually and as executor of his father’s succession.
After trial on the merits, the trial court .issued extensive and thorough reasons for judgment. After addressing lawful and unlawful causes of contracts, the trial court found the contract was ambiguous in that it did not describe the “services rendered.” Citing La. C.C. art. 2053,[2] the trial court examined the parties’ conduct before and after the execution of the contract to determine the intent of the decedent and Harrison. The trial court listed evidence of the provocative and sexual nature of the correspondence between the parties, the contract negotiations entwined with sexual banter, and the sexual relations of the parties.
While Harrison maintained her services rendered were for cooking, cleaning, driving, and administering of medication and general care, the trial court agreed with the succession that the contract was for *628 sexual services, |3which made the contract illicit, immoral and absolutely null. Finding that Harrison was not a credible witness, the trial court found the contract was absolutely null, having been entered for a sexual purpose. In so ruling, the trial court included these findings:
• the contract was vague, unclear, and ambiguous, in that it did not describe the “services rendered”;
• the “services rendered” contemplated by this contract[3] were sexual in nature, rendering the contract an absolute nullity;
• Judy Harrison was not a credible person, rendering hollow her allegations that her role was as a “caretaker”; and
• Harrison’s “purpose in returning to Louisiana was to take advantage of Dr. Rhodes and his sizable estate.”
Included in the evidence supporting the trial court’s finding that the contract was for sexual services were:
• the suggestive, if not salacious, emails;
• the photo of Harrison’s thighs taken while she was in bed;
• the photo of her pink bedroom in Georgia and comments that Dr. Rhodes regretted not being invited to try it out;
• discussions of monetary terms in exchange for her providing “tenderness and closeness” that neither the decedent’s son nor daughter-in-law could provide;
• his expressions of love and their pet names for each other;
• the anticipations of being live-ins “too old to have to string a sheet between the beds”;
• fifteen days before the contract was signed, the sexually linked language including “since we are going to join and become a couple,” please keep the faith until you are in my arms and that’s the way it is when you are in Love; and
14» the discussion ending with comments about Napoleon’s obsession with Josephine’s scent, Kama Sutra and videos.
DISCUSSION
Under Louisiana law, formation of a valid and enforceable contract requires capacity, consent, a certain object, and a lawful cause. Crowe v. Homesplus Manufactured Housing, Inc., 38, 382 (La. App. 2 Cir. 6/21/04), 877 So.2d 156. La. C.C. art. 1967 states that cause is the reason why a party obligates himself. The cause of an obligation is unlawful when enforcement of the obligation would produce a result that is a violation of law or against public policy. La. C.C. art. 1968.
Harrison correctly points out that there is no Louisiana law against unmarried adults of the opposite sex having sexual relations. She maintains that even if the contract were construed to be a contract for sex, the contract would not violate the prostitution law which requires indiscriminate sex. La. R.S. 14:82. In her view, therefore, there was no underlying illegal relationship which rendered the contract meretricious. Since the couple’s intercourse did not violate state criminal law, Harrison argues that the trial court’s action permits a child to police the sexual activities between a parent and a totally unrelated person, in this case, herself.
This alleged contract was ambiguous because the only definition of the obligation was “for services rendered.” The examination of this testimony and evidence reflects a definite sexual component to the document. To be fair, the parties also *629 contemplated that Harrison would act as a caregiver to Dr. Rhodes.
|sThe record revealed that, prior to his death, she briefly cooked, cleaned, and cared for him, helping him with his medical and personal needs, including bathing and transportation. Dr. Rhodes paid Harrison’s moving expenses and rent on her apartment where he visited her conjugally before Harrison moved into his home about one month prior to his death.
Admitting the relationship was sexual, Harrison stated she loved Dr. Rhodes and gave uncorroborated testimony that Dr. Rhodes proposed marriage to her days before he died.
In the very old case of Succession of Rabasse, 49 La. Ann. 1405, 22 So. 767 (1897), the court disallowed a claim against Rabasse’s succession, based upon his writing that he desired to take care of a family who had eaten with him, cooked for him and been very intimate friends. The supreme court found that caretaking services rendered to Rabasse were not of a type that would give the expectation to those who rendered them of compensation nor he who received them of the obligation to compensate.
They were merely the customary, almost necessary, incidents which result from a close, intimate relation between parties, — services leading up to affection and friendship, and the performance of reciprocal services, but not to payment in money. They are services which do not give rise to debt or to remunerative donations, but might very legitimately and naturally give rise to donations proper.
Rabasse, 49 La. Ann. at 1426, 22 So. 767.
Clearly, both parties' envisioned and briefly engaged in a live-in relationship with each acting as a quasi-spouse to the other. Indeed, Harrison stated she moved into his late wife’s room. A concubine is one who occupies the position, performs the duties, and assumes the I ^responsibilities of a wife, without the title and privileges flowing from a legal marriage. Succession of Bacot, 502 So.2d 1118 (La.App. 4th Cir., 1987), unit denied, 503 So.2d 466 (La.1987).
In Guerin v. Bonaventure, 212 So.2d 459 (La.App. 1st Cir.1968), the court rejected a paramour’s claim for ownership interest in Bonaventure’s business enterprises, since the relationship was independent of their live-in relationship.
In view of the parties living together as man and wife, it was only natural that plaintiff lend some assistance to the paramour who furnished full subsistence and a home for plaintiff and her child as if they were his lawful wife and offspring. In this manner plaintiff received full remuneration for services rendered to defendant Bonaventure in performing the duties of mistress of his household and some measure of assistance in his various business enterprises.
Guerin, 212 So.2d at 464.
The trial court relied upon Succession of Payne v. Pigott, 459 So.2d 1231 (La.App. 1st Cir.1984), which held that where parties to a contract cohabit in a sexual relationship and their agreement to cohabit is part of the basis for the agreement between them, the agreement is unenforceable because it is an unlawful contract for meretricious services.
It is not necessary for this court to decide that the “employment contract” was meretricious or violative of public policy. This document is essentially a conditional obligation with a suspensive condition. This obligation could not be enforced until the uncertain event occurred (death or incapacity). C.C. art. 1767. Both Dr. Rhodes and Harrison could cancel at any time without Harrison getting a dime. *630 She could have walked away at any time, receiving no funds whatsoever. A condition that depends solely 17on the whim of both parties makes the obligation null. C.C. art. 1770. Looking at it the . other way, even if she had provided Dr. Rhodes with “services” for two decades, he could have still canceled this relationship on his deathbed, leaving her with nothing. This “employment contract” was truly dependent on the whim of both parties.
The “contract” was not a valid donation inter vivos (neither gratuitous, nor remunerative, nor onerous) due to its uncertain and contingent nature, the absence of delivery of the money, and the spouse-like nature of the relationship.
It also does not qualify as a donation mortis causa because it is not in the mandatory form of an olographic or notarial will.
Dr. Rhodes, though not wealthy, was well off, and he could have easily given something to Harrison, had he chosen to do so, via:
• a valid donation inter vivos,
• a valid donation mortis causa, or
• a valid employment contract, paying her a traditional and reasonable salary for specific and appropriate care-taking services.
The document they signed indicates strongly that Dr. Rhodes desired to do none of these things. He wanted to remain in total control of the relationship. A particularly punitive provision required that Harrison could not make a claim against his estate or receive any other payments or promises aside from that in the “employment contract.” He also carefully remained in strict control of his assets by instructing his attorney to draft a document which either party could terminate at any time without any reason. Harrison was to receive nothing regardless of who ended their | ¡^relationship. This attorney testified Dr. Rhodes also rejected his advice concerning a traditional salary arrangement for Harrison.
Harrison maintained that her services rendered were for cooking, cleaning, driving, and administering of medication and general care. Her innocent explanation of the relationship was rejected by the trial court which found that Harrison lacked credibility. Dr. Rhodes even admitted the pecuniary nature of the situation when he told his daughter-in-law that payment was the only way for a person his age to have a relationship. In November of 2002, sexually-charged financial negotiations commenced in earnest for her return from Atlanta, Georgia, to Shreveport. Amidst tender protestations of affection, Harrison was very frank about requiring compensation for making the move. She emailed him that she knew “what she was capable of’ and that he “would be a happy man.” The discussions of the parties centered on the decedent’s need for intimate female companionship, not on Harrison’s transportation and domestic duties.
She moved back in early February of 2003, with her moving and setup expenses being paid, by Dr. Rhodes, with whom she’d already commenced a sexual relationship. The “Employment Contract” was executed in mid-February. Harrison moved in with Dr. Rhodes in late February of 2003. Before she arrived upon the scene, the son and daughter-in-law were taking care of all his needs, except his desire for sexual intimacy. After arguing bitterly about Harrison, the son and daughter-in-law acceded to the demands of Dr. Rhodes that they move out. Sadly, Dr. |aRhodes died the next month without a reconciliation between father and son.
The true cause for this contract was a gratuity, based on love, affection and sex, however one views their relationship.
This document is not:
*631 • a valid onerous inter vivos donation, nor is it
• a valid employment contract, nor is it
• a valid donation mortis causa.
It is hard to categorize exactly what to call this instrument drafted as directed by Dr. Rhodes. The “contract” quacks, waddles and flies as if it is some hybrid permutation of an invalid last will and testament or donation inter vivos.
Again, it must be noted that Harrison did in fact provide this old man other services besides just sex and companionship. Harrison’s other brief assistance to Dr. Rhodes, however, is insufficient to convince us that we should interpret this document, whatever it may be called, as a legitimate onerous or remunerative donation.
Since the death of Dr. Rhodes, Harrison has married for the sixth time. She met her latest husband on the Internet.
Although apparently smitten with Harrison, the lonely and amorous Dr. Rhodes created a document that appeared to reward Harrison but essentially obligated neither of them to anything beyond their affection for one another for only so long as both of them desired to continue the relationship. Although Harrison could be viewed as an Internet predator |introlling for elderly victims, she met her match in Dr. Rhodes, who kept a firm hold on his finances to the end. Instead of getting a golden egg from the goose (actually, a gander), Harrison must leave the relationship with only feathers and presumably her fond memories.
For all the foregoing reasons, Harrison is not entitled to recover from Dr. Rhodes’ estate.
DECREE
The judgment of the trial court is affirmed, at the cost of Judy Harrison.
AFFIRMED.
APPLICATION FOR REHEARING
Before STEWART, CARAWAY, DREW, MOORE, and LOLLEY, JJ.
Rehearing denied.
*632 Jil
[[Image here]]

. The "employment contract" is attached as appendix "A.”

. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.

. The trial court held that “the contract existed for illicit, immoral, and meretricious purposes, and is an absolute nullity.”