Judgment rendered August 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,861-CA
No. 55,862-CA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

No. 55,861-CA

SUCCESSION OF CURTIS TINO THOMPSON, SR.

* * * * *

*consolidated with*

* * * * *

No. 55,862-CA

SUCCESSION OF CURTIS THOMPSON

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court Nos. 2021-3067 and 2021-3337

Honorable Don C. Burns, Judge (*Ad Hoc*)

* * * * *

CARL VAN SHARP                          Counsel for Appellant,
                                        Belle Jones

MARY ALICE BRYANT                       Counsel for Appellee,
                                        Metha Michelle
                                        Thompson

* * * * *

Before STEPHENS, THOMPSON, and MARCOTTE, JJ.

**THOMPSON, J.**

This is a cautionary tale that intertwines diminished capacity and the potential for undue influence, in which an elderly gentleman suffering from progressive dementia dating back to 2012, who was subsequently interdicted, was set upon by his caretaker in tireless efforts to gain control of his assets. Her efforts included use of a power of attorney to transfer assets to herself, two attempts to have wills drafted in her favor, attempting to intervene in his interdiction proceeding, and a failed 2019 attempt to have the 81 year old gentleman marry her, which was only foiled when the attentive justice of the peace refused to perform the ceremony after speaking with the intended groom and quickly confirming he lacked capacity.

Upon his death in 2021, a succession proceeding was instituted by his children, and the caretaker responded by filing a separate succession proceeding and presented a 2019 notarial will that benefitted her, which had been drafted during the pendency of the testator's interdiction proceeding. After the dueling succession proceedings were consolidated, the notarial testament was declared a nullity by the court due to the lack of capacity. In response, the caretaker presented a 2017 handwritten will, also in her favor. The trial court subsequently also declared the second will a nullity based on a lack of capacity of the testator. The caregiver now appeals that decision, and for the reasons set forth herein, we affirm the trial court's judgment.

### FACTS AND PROCEDURAL HISTORY

Curtis Tino Thompson, Sr. ("Curtis") died on September 28, 2021, at the age of 83. Curtis had been married only once, and he was predeceased by his former wife, Lola Mae Thompson, with whom he shared six children. In all, Curtis fathered ten children and was survived by nine, including his

daughter, Metha Michelle Thompson ("Michelle").  Following her father's

passing, Michelle filed a petition for intestate succession,[1] in which she

sought and was appointed as the Independent Administratrix of the

succession (Docket #21-3067).  Despite the pending intestate proceeding

initiated by Michelle, a separate succession action was filed on November

10, 2021, by Belle Jones ("Jones"), Curtis's caretaker in his later years.  This

first action filed by the caretaker was a petition for execution of testament,

which included a purported statutory will by Curtis dated May 7, 2019

(Docket #21-3337).  Jones asserted in her filing with the court that she had

been named as the executrix and universal legatee of Curtis in this testament.

An order was signed by the court, which may have been unaware of the

already opened succession proceeding for Curtis, naming Jones as the

executrix of his estate.

On December 10, 2021, Michelle filed a motion to disqualify Jones as

the executrix and supplement her petition to annul the statutory will.

Michelle alleged in her motion that through abuse of a power of attorney that

Jones had transferred Curtis's vehicles into her name and taken over $60,000

from his bank accounts, all while knowing that Curtis had suffered from

dementia for many years.  Michelle argued that Jones should be disqualified

under La. C.C.P. art. 3097(A)(6) because she is a person of "bad moral

character" and exploited Curtis.  Michelle argued Jones had exploited Curtis,

a person with infirmities, in violation of La. R.S. 14:93.4.  Michelle further

noted that she filed a petition for interdiction[2] for Curtis on October 10,

---

[1] Filed in the Fourth Judicial District Court, Ouachita Parish, Louisiana on
October 15, 2021

[2] Docket #18-3328 in the Fourth Judicial District Court, Ouachita Parish,
Louisiana.

2

2018, and that the judgment of interdiction of Curtis was filed on February 6, 2020, in which Jones had attempted to intervene. With two pending succession proceedings in the same court, an intestate succession filed by Michelle and a testate succession filed by Jones, a motion to consolidate the two successions and other various motions was filed and granted by the trial court.

A hearing was held on November 22, 2022, on the various motions, and the trial court ruled that the two succession proceedings would be consolidated into a single administration action. The trial court further ordered that:

- The notarial testament of Curtis, dated May 7, 2019 and filed by Jones, was null because interdiction proceedings had been brought against Curtis at that time based upon numerous infirmities exhibited by him in the months and years leading up to the filing of petition for interdiction.

- The order appointing Jones as testamentary executrix was vacated and the court terminated Jones's appointment.

- The independent administration was converted to an administration under court supervision, with Michelle remaining as Administratrix.

- Proceeds from certain life insurance policies on Curtis were ordered to be deposited into the court registry.

- A hearing was set for consideration of the validity of a purported olographic testament of Curtis dated December 26, 2017, which had subsequently been presented by Jones.

On February 6, 2023, the trial court conducted the hearing to determine whether Curtis was capable of executing an olographic will on

December 26, 2017, and, if so, whether he actually executed it. Several witnesses testified at that hearing. The first person to testify was Curtis's treating physician, Dr. Clyde Elliott, who was qualified as an expert in the diagnosis, recognition of signs, and treatment of dementia and Alzheimer's by the court. He testified that Curtis suffered from generalized brain atrophy that affected all spheres of his functioning and that this atrophy was global and permanent. He diagnosed Curtis with dementia in 2012 and noted that the disease would only worsen with time. Specifically, Dr. Elliott testified:

> His dementia had deteriorated from 2012 significantly as it went along **by 2018, he was incompetent**. **He was almost incompetent in 2012.** Would have difficulty supporting him to make anything at that point. He was already getting lost. We were thinking in terms of Alzheimer's – thinking in terms of dementia. We had the findings with the MRI and the VA was seeing the same thing that I was seeing. And at that point, if somebody had asked me to render an opinion as to whether he would be competent to do anything, I would have had a difficult time even in 2012.

(emphasis added). Dr. Elliott testified that he met with Curtis in January of 2018, only days after the olographic will was created, and stated that he was not competent to draft a will. He testified:

> Q: Okay. So, is it your testimony that if he had made…some will within a month before, is it your testimony that…he would not have been competent?
>
> A: No, ma'am. He would not be competent.

Dr. Elliott did testify that he often saw Curtis with Jones and that he seemed well cared for by Jones. Next, Lilly Harris Augurson testified that she and Curtis had been friends since the 1960s. She testified she and Jones are friends and speak almost every day, and about Curtis's good relationship with Jones. She stated that he told her he had created a will and left

4

everything to Jones.  Finally, she testified that the signature on the olographic will looked like Curtis's handwriting.

Jones testified that she had known Curtis for over 20 years, and they met at church.  He is 24 years older than her.  She testified they had a friendship and then a romantic relationship.  Jones testified that she called him Mr. Thompson and he called her Ms. Jones.  She drove him to his appointments.  She admits that she was married at the time she had a relationship with Curtis but testified that she and her husband were separated.  She stated that she was writing out checks for his bills but he was signing the checks.  She testified she witnessed him drafting the olographic will.  She alleged that he did not trust his children and wanted to leave everything to her.  She told Curtis that he needed to make sure to sign and date the olographic will.  When questioned how she knew the requirements for an olographic will, she testified that lawyer shows on tv and her nephew, Matthew Sims, told her about the requirements.  Jones testified that in December of 2017, she was driving Curtis, preparing his food, and dressing him because he could not dress himself.  Jones became his power of attorney in 2016.

Stewart Parker, a Louisiana justice of the peace, was asked by Jones to conduct a marriage ceremony for Jones and Curtis in 2019.  Judge Parker testified:

> Ms. Jones had informed me that she had just gotten divorced.
> And I asked Mr. Thompson over by the car because he had
> problems moving around.  So, I asked him when he got out of
> the car if he knew where he was at. He said no. **I said do you
> understand you're here to get married? He said, me? I said,
> yes, sir. He said, I'm getting married?** I said, yes, sir. I asked
> him if he knew what day it was. He didn't. I asked him if he
> knew what time it was.  He didn't. So, at that point, -- of course
> understanding that she had just got divorced from her husband,

> I made a determination -- which I am supposed to do -- that I couldn't marry this man and this woman, because he had no – no idea what was even going on.

(emphasis added). Judge Parker testified that he called the Attorney General's Office and was told that he had made the correct decision not to marry Jones and Curtis under these circumstances. He also testified that it was a red flag to him that Jones's ex-husband, who she had just obtained a divorce from, was present at the wedding as a witness.

Matthew Sims, Jones's nephew, testified that he spoke with Curtis in 2016 to ask about his intentions with Jones. He stated that Curtis told him he wanted his children to leave him and Jones alone and that he wanted to provide for Jones in the event of his death. He testified that he suggested to Curtis that he put his wishes in writing: "write it yourself, sign it and date it, and give that to her, whether it's your kids or whoever else, your intentions will be known in your own handwriting." He testified that he was called by Jones to come to the house for support when Curtis's children came to visit.

Attorney Arthur Gilmore, Jr. testified that he prepared the 2019 statutory testament that was declared invalid by the trial court. He stated that Curtis wanted the will drawn up and he signed it without Jones present, although she accompanied him to the appointment. He testified *if* he had known Curtis had been interdicted: "It would have raised a red flag. I would have done a little more research on it and would not have – probably would not have done the will." He testified that he had previously represented Jones in another matter.

Stephen Gilmore Cezar testified that he was Curtis's son-in-law. He testified that Curtis wrote in cursive and never wrote in print. He testified that the handwriting on the olographic will was not Curtis's handwriting.

6

Michelle also testified, and she asserted that the handwriting on the purported olographic will was *not* her father's handwriting. She further testified that her father told her that when his dementia got bad, he would move to Texas to be near her as she is a registered nurse and could take care of him.

The record reflects that at the hearing, the trial court limited testimony to Curtis's capacity to execute a will and whether he actually drafted the olographic will. In its ruling, the court noted that Jones was the only witness present when Curtis signed the olographic will. The court further noted the conflicting evidence presented about whether the signature was authentic. The trial court reviewed Dr. Elliott's testimony and Curtis's medical records and stated:

> I note that in April of 2018, Dr. Elliott said he was not competent to perform any sort of—legal documentation. What concerns me also, his notes say, in January of 2018, he found that same competence just a few days after the execution of the will. When asked on direct whether or not he could say that Mr. Thompson was competent when he made this will, he said that he could not say that. I think under the circumstances, Dr. Elliott's testimony and the VA records present to the Court a situation where it creates an inference that he was not competent. I haven't heard anything today that would relate back to this December 27th…date, that he had any sort of a lucid interval or anything that…he was competent to…sign that.

The trial court stated that the record was overwhelming that Curtis was not competent to execute the olographic will on the date and found the will to be invalid. Having resolved the issue of Curtis' competency to sign the will, the court specifically made no determination on whether Curtis actually wrote the olographic will himself. In its judgment, the court denied Jones's petition to probate the olographic will. Jones subsequently filed a

7

motion for new trial, which the trial court denied. This appeal by Jones followed.

## DISCUSSION

In her sole assignment of error, Jones asserts that the trial court committed reversable error when it declined to consider the testimony from witnesses other than that of Dr. Clyde Elliot, Curtis's primary physician. She contends that in disregarding the testimony of the other witnesses and, in effect, disregarding all evidence contrary to the opinion of Dr. Elliot, the court failed to require Michelle to satisfy the legally required burden of proof imposed upon one who challenges the capacity of testator, *i.e.* clear and convincing evidence. We note at the outset that the trial court's consideration of testimony is distinctly different from the credibility it assigns to that testimony.

All persons have capacity to make and receive donations *inter vivos* and *mortis causa*, except as expressly provided by law. La. C.C. art. 1470. Capacity to donate *mortis causa* must exist at the time the testator executes the testament. La. C.C. art. 1471. There is a presumption in favor of testamentary capacity. *Succession of Wood*, 55,360 (La. App. 2 Cir. 11/15/23), 375 So. 3d 600, *writ denied*, 24-00168 (La. 4/3/24), 382 So. 3d 108; *In re Succession of Furlow*, 44,473 (La. App. 2 Cir. 8/12/09), 17 So. 3d 475. Testamentary capacity means the donor must be able to comprehend generally the nature and consequences of the disposition that he is making. *Id*. A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time he executed the testament. La. C.C. art. 1482. The issue of capacity is factual in nature; the ultimate finding that the testator either possessed or lacked

8

capacity cannot be disturbed unless clearly wrong or manifestly erroneous. *Succession of Woods*, *supra*.

In will contest cases, absent a finding of manifest error, the factual findings of the trial court are accorded great weight and will not be disturbed on appeal. *Succession of Moore*, 54,338 (La. App. 2 Cir. 3/30/22), 339 So. 3d 12, *writ denied*, 22-00973 (La. 10/04/22), 347 So. 3d 859. The factfinder is required to assess the credibility of all witnesses, whether they be lay people or experts, to determine the most credible evidence. Expert testimony is to be weighed the same as any other evidence, and the trier of fact can accept or reject, in whole or in part, any expert opinion. Such credibility determinations are factual issues to be resolved by the trier of fact and should not be disturbed on appeal absent manifest error. *Moore*, *supra; James v. Robinson*, 38,774 (La. App. 2 Cir. 8/18/04), 880 So. 2d 975.

There are two forms of testaments: olographic and notarial. La. C.C. art. 1574. An olographic testament is one entirely written, dated, and signed in the handwriting of the testator. La. C.C. art. 1575. The only additional requirement is that the document itself must evidence testamentary intent to be a valid testament. *In re Succession of Rhodes*, 39,364 (La. App. 2 Cir. 3/23/05), 899 So. 2d 658, *writ denied*, 05-1044 (La. 6/3/05), 903 So. 2d 460. The proponent of an olographic will has the burden of proving its authenticity and its compliance with all of the formal requirements of law. La. C.C.P. art. 2903; *Moore*, *supra*.

In the case at bar, the trial court found that Michelle met the burden of proving by clear and convincing evidence that Curtis lacked capacity at the time he executed the olographic will. Our review of the trial court's judgment indicates that the court thoughtfully considered the testimony from

9

all of the witnesses and evidence presented and earnestly considering the testimony of each and all evidence presented. The court acknowledged the conflicting testimony from the various witnesses regarding whether the signature on the olographic will looked like Curtis's signature. The court further acknowledged that Jones testified that Curtis was lucid and drafted the entirety of the olographic will in front of her because he wanted to provide for her after he was gone. However, the court found the testimony of Curtis's treating physician and the accompanying medical records to overwhelmingly indicate that Curtis did not have testamentary capacity when the olographic will was drafted. We cannot say the trial court's assigning credibility between witnesses is manifestly erroneous.

We must afford great deference to the finding of facts and credibility assessments made by the trial court in this matter. *James v. Robinson*, 38,774 (La. App. 2 Cir. 8/18/04), 880 So. 2d 975. Moreover, our review of the record makes obvious that we must affirm the trial court's findings. Dr. Elliott was Curtis's longstanding primary care physician, who testified that Curtis suffered from dementia in 2012 and was almost incompetent then and that the disease would only worsen as he aged. Dr. Elliott examined Curtis mere days after the olographic will was drafted and determined that he would not have had testamentary capacity when he was alleged to have drafted and signed the will.

The only testimony provided in support of any sort of alleged capacity was made by people with obvious mercenary interests in Curtis. Although the trial court limited any testimony to refrain from argument regarding undue influence, we must note that we found the orchestrated and intensified efforts by Jones to obtain control of Curtis's estate alarming. Curtis was

10

almost incompetent in 2012 and getting progressively worse, and during that time period there was: a power of attorney in Jones's favor in 2016, transfers of assets in favor of Jones, a purported olographic will in her favor in 2017, her intervention attempts and knowledge of Curtis's interdiction in 2018, a notarial will attempt in 2019, and an attempt to have Jones marry her in 2019 at a time when he clearly did not know where he was or why he was there and the justice of the peace did his duty by refusing to perform the ceremony.

We find the testimony of Judge Parker to be particularly illustrative. Jones, in the company of her very recent ex-husband, attempted to marry 81-year-old Curtis, after interdiction proceedings for him had already begun. Judge Parker thoughtfully and appropriately executed his duties by asking Curtis simple questions that revealed he was not capable of being married. The fact that Jones sought to marry a man who did not know what day it was or that he was getting married clearly exposes her nefarious intent and continuing efforts to gain control of and enjoy the benefits of Curtis's assets. It was entirely appropriate for the trial court to find that Curtis did not have the capacity to execute an olographic will in December of 2017 based on the great weight of the testimony and evidence presented. Jones's assignment of error is without merit, and the trial court's ruling is affirmed.

## CONCLUSION

For the foregoing reasons, the trial court's ruling denying Belle Jones's petition to probate of olographic will is affirmed. Costs of this appeal are assessed to Belle Jones.

**AFFIRMED.**